**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SANTOS RAFAEL IRAHETA-
MARTINEZ, AKA "Jose Benigno,"
AKA "Santos Climaco,"

*Petitioner*,

v.

MERRICK B. GARLAND, Attorney
General,

*Respondent.*

No. 18-72692

Agency No.
A098-912-596

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted February 11, 2021
San Francisco, California

Filed September 7, 2021

Before: Andrew D. Hurwitz and Daniel A. Bress, Circuit
Judges, and Gary Feinerman,[*] District Judge.

Opinion by Judge Feinerman

    [*] The Honorable Gary Feinerman, United States District Judge for
the Northern District of Illinois, sitting by designation.

## SUMMARY[**]

### Immigration

Denying Santos Iraheta-Martinez's petition for review of a decision of the Board of Immigration Appeals, the panel held that: (1) because Iraheta's prior removal order was reinstated, he had no right under the Immigration and Nationality Act ("INA") to seek asylum, and no constitutional right to have the Department of Homeland Security consider whether as a discretionary matter to decline to reinstate that removal order; and (2) the Board applied the correct frameworks governing the denial of withholding and protection under the Convention Against Torture, and its factual basis for denying such relief was supported by the record.

Iraheta raised a statutory and constitutional claim concerning his eligibility for asylum relief in reinstatement proceedings. As an initial matter, the panel concluded that there was no need to decide whether Iraheta had exhausted these arguments because doing so would have been futile, given regulatory limitations on reinstatement proceedings, and circuit precedent holding that the agency lacks authority to disregard those regulations.

Iraheta's statutory claim rested on the interplay of several INA provisions providing and limiting the right to apply for asylum. Under 8 U.S.C § 1158(a): "Any alien who is physically present in the United States or who arrives in

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the United States . . . , irrespective of such alien's status, may apply for asylum." That broad authorization, however, is subject to exceptions set forth in §§ 1158(a)(2)(B) & (C)— the one-year and previous denial bars. Those bars in turn are subject to their own exception in § 1158(a)(2)(D), upon a showing of material "changed circumstances." For noncitizens subject to reinstatement of a prior removal order, § 1231(a)(5) provides that they are not eligible and may not apply for "any relief" under this chapter. Iraheta argued that notwithstanding § 1231(a)(5), he was eligible to seek asylum under § 1158(a)(2)(D)'s exception if he could show changed circumstances.

The panel observed that *Perez-Guzman v. Lynch*, 835 F.3d 1066 (9th Cir. 2016), left open the question, at issue here, of how § 1158(a)(2)(D) might affect § 1231(a)(5), where a noncitizen asserts changed circumstances. Looking to the statutory language and various textual clues, the panel concluded that the INA makes clear that noncitizens with reinstated removal orders, while eligible to seek withholding and CAT relief, are not eligible to seek asylum. The panel rejected Iraheta's invocation of the general-specific canon, under which he argued that § 1158(a)(2)(D) more specifically governs his asylum eligibility than does § 1231(a)(5). The panel explained that the determining which statute is "general" and which is "specific" is an unilluminating exercise, rendering the canon inapplicable, and a close reading of both provisions reveals that there is no conflict, also rendering the canon inapplicable.

The panel also rejected Iraheta's argument that because the INA allows noncitizens with reinstated removal orders to seek withholding and CAT relief despite § 1231(a)(5), asylum should be available, as well. The panel explained that the availability of certain relief notwithstanding

§ 1231(a)(5) only underscores that the INA and its implementing regulations offer a comprehensive set of rules governing which noncitizens are eligible for what forms of relief, and the INA makes clear that noncitizens with reinstated removal orders are not eligible for asylum. The panel also rejected Iraheta's contentions that his reading of the statutes was required under the constitutional avoidance canon and to avoid running afoul of the United States's treaty obligations, explaining that neither principle came into play here, because there is no ambiguity in the relationship between §§ 1158(a)(2)(D) and 1231(a)(5).

Relying on *Villa-Anguiano v. Holder*, 727 F.3d 873 (9th Cir. 2013) (noting that nothing in 8 U.S.C. § 1231(a)(5) or its implementing regulations deprives the agency of discretion to afford a new plenary removal hearing), Iraheta argued in the alternative that even if the INA did not afford him a statutory right to seek asylum, because DHS has the discretion to overlook a prior removal order rather than reinstate it, due process required DHS to consider his changed circumstances before deciding whether to reinstate the order or place him in ordinary removal proceedings. The panel rejected that argument, explaining that *Villa-Anguiano* did not create a due process right to present an argument that may sway DHS in the exercise of its purely discretionary authority to overlook a prior removal order, and that recognizing such a right would undermine the agency's plenary discretion over when to exercise that form of leniency.

Turning to Iraheta's claims for withholding of removal and CAT protection, the panel concluded that the evidentiary record supported the denial of relief. Both the Board and IJ assumed that the abuse Iraheta faced in his youth by his father qualified as persecution due to his perceived sexual

orientation, thus creating a presumption that he would be persecuted in the future as well. The panel concluded that the agency properly applied the burden-shifting framework in determining that the government had rebutted the presumption of future persecution with evidence that circumstances have changed now that Iraheta is a grown man who no longer needs to live with his father.

The panel also held that the evidence did not compel the conclusion that Iraheta would more likely than not be persecuted by anyone else on account of his perceived sexual orientation, or by gang members or his brother based on his anti-gang beliefs. The panel concluded that the Board also adequately considered the aggregate risk of torture in denying CAT protection.

## COUNSEL

Etan Newman (argued), Pangea Legal Services, San Francisco, California, for Petitioner.

Mona Maria Yousif (argued), Attorney; Brianne Whelan Cohen, Senior Litigation Counsel; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

**OPINION**

FEINERMAN, District Judge:

Santos Rafael Iraheta-Martinez petitions for review of a Board of Immigration Appeals ("BIA") order denying his application for withholding of removal and relief under the Convention Against Torture ("CAT"). We find no error in the BIA's denial of that relief. Iraheta also challenges the BIA's refusal to allow him to seek asylum in light of the reinstatement of his prior order of removal, arguing that he had a right to seek asylum under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, and in the alternative that he had a procedural due process right to reasoned consideration by the Department of Homeland Security ("DHS") of whether to forego reinstating his prior removal order and thereby allow him to seek asylum. We disagree and hold that a noncitizen in Iraheta's circumstances enjoys neither right. We therefore deny his petition for review.

**I**

**A**

Iraheta grew up in El Salvador as one of eleven children. His father, Victor, was physically and emotionally abusive toward all his children, and was especially harsh with Iraheta because he believed that Iraheta was gay. In addition to subjecting Iraheta to beatings, Victor routinely berated him with homophobic slurs.

When Iraheta was about 18 years old, he suffered a particularly severe public beating from his father and felt he could no longer return home. In 2005, Iraheta fled El Salvador, entered the United States unlawfully, and was

apprehended. He did not appear at his April 2006 removal hearing, and the immigration judge ("IJ") entered a removal order against him *in absentia*. Iraheta ultimately was apprehended and removed in 2009, but reentered the United States days later. Over the next two years, Iraheta reentered the United States twice more and was removed both times.

After his latest removal in September 2010, Iraheta returned to his parents' home in El Salvador. Victor became outraged when he saw that Iraheta was wearing an earring, "yelling something like, 'I never thought I'd have a fucking faggot in my house.'" Victor ripped the earring out of Iraheta's ear and told him he never wanted to see Iraheta in his home again. Iraheta fled once again to the United States, where he now resides with his wife and their two sons.

In 2016, Iraheta's brother Valentin, who still lives in El Salvador, informed Iraheta that he had become involved with the MS-13 gang. Iraheta expressed disapproval and urged his brother to stop associating with the gang. Valentin became angry and told Iraheta that if he were to return to El Salvador and continue to criticize Valentin's membership in MS-13, Valentin would "do whatever he wanted" to Iraheta. Iraheta asked if Valentin would murder his own brother, and Valentin responded that if Iraheta returned to El Salvador, Valentin would "'either kill you myself or send my homies to kill you.'"

## B

### 1

In May 2017, Iraheta was taken back into custody, and DHS reinstated his prior removal order. *See* 8 U.S.C. § 1231(a)(5) (authorizing reinstatement of a prior removal order "[i]f the Attorney General finds that an alien has

reentered the United States illegally after having been removed"); 8 C.F.R. § 1241.8(a) ("An alien who illegally reenters the United States after having been removed, or having departed voluntarily, while under an order of exclusion, deportation, or removal shall be removed from the United States by reinstating the prior order. The alien has no right to a hearing before an immigration judge in such circumstances.").

Iraheta expressed a reasonable fear of returning to El Salvador, so an asylum officer referred his case to an IJ for "withholding-only" removal proceedings to determine his eligibility for withholding of removal and relief under CAT. *See* 8 C.F.R. § 208.31(e); *Alvarado-Herrera v. Garland*, 993 F.3d 1187, 1190 (9th Cir. 2021) ("If the asylum officer determines that the non-citizen [with a reinstated removal order] has established a reasonable fear, the non-citizen is placed in 'withholding only' proceedings before an immigration judge, during which the judge will hold a hearing on whether to grant the non-citizen withholding of removal or protection under CAT.") (citing 8 C.F.R. § 208.2(c)(2)–(3)).

Before the IJ, Iraheta filed a "motion to preserve his right to apply for asylum," purporting to "preserve the argument that he remains eligible for asylum even though he is in withholding-only proceedings" and asking that the "record . . . reflect that [he] does not concede that he is not eligible for asylum." Iraheta conceded that he was asylum-ineligible under *Perez-Guzman v. Lynch*, 835 F.3d 1066 (9th Cir. 2016), but argued that he might become eligible if his prior removal order were reopened or if the Supreme Court reversed *Perez-Guzman*.

The IJ denied Iraheta's motion, stating that he "is not eligible for asylum because he is in 'withholding only'

proceedings," and noting that he "has presented the legal issue . . . should there be a change in the law." The IJ then addressed whether Iraheta was entitled to withholding of removal or CAT relief. As to Iraheta's claim for withholding based on persecution by Victor for being perceived as gay, the IJ observed that "[i]f an alien demonstrates that he suffered past persecution in the proposed country of removal, the burden shifts to [DHS] to demonstrate that a fundamental change in circumstances has occurred in that country, or that [he] could safely relocate to another area in the proposed country of removal." *See* 8 C.F.R. § 1208.16(b)(1). Applying that standard, the IJ found that even if Iraheta had suffered past persecution, "circumstances have changed" because, while Victor had abused Iraheta when he was a youth, Iraheta was now "a grown man" who was "not required to live in his father's house." The IJ added that Victor "is an aging man" and that Iraheta's brothers, including one still living with Victor, no longer faced abuse.

As to Iraheta's claim that he was likely to face persecution from his brother Valentin on account of his anti-gang political opinion, the IJ found that "a singular threat from his brother is insufficient to sustain his burden of demonstrating that he is likely to be persecuted or harmed in any way by his brother upon return to El Salvador." Concluding that Iraheta had not shown that he was likely to be persecuted by either his father or his brother, the IJ denied withholding of removal.

Turning to CAT relief, the IJ held that Iraheta "ha[d] failed to demonstrate that he is likely to be harmed by his father, his brother, or members of MS-13 upon removal to El Salvador," and that he therefore "is not likely to be harmed for purposes of the [CAT]." The IJ further found

that Iraheta "ha[d] failed to establish the acquiescence piece of his [CAT] claim." *See* 8 C.F.R. § 208.18(a)(1).

**2**

Iraheta appealed. The BIA dismissed the appeal, reasoning as to Iraheta's withholding claim that the IJ did not clearly err in finding a fundamental change of circumstances sufficient to rebut the presumption of future persecution, and discerning no clear error in the IJ's finding that he could relocate within El Salvador. *See* 8 C.F.R. § 1003.1(d)(3)(i). In particular, the BIA held that the IJ "did not clearly err in finding that the applicant's father has aged, the applicant is now an independent adult man with a family of his own, and the applicant need not live with or associate with his father upon return to El Salvador." The BIA thus concluded that, "even assuming, as the Immigration Judge did, that [Iraheta] suffered past persecution by his father on account of a protected ground, [DHS] has rebutted the presumption that [his] life or freedom will be threatened in the future on the basis of the original claim."

As for Iraheta's CAT claim, the BIA agreed with the IJ that "the single, unfulfilled threat by his brother approximately 2 years ago is [in]sufficient to establish that he will more likely than not be tortured upon return to El Salvador by his brother or the MS-13." The BIA also agreed with the IJ that the evidence of past abuse by Iraheta's father was not enough to show a likelihood of torture on account of his perceived sexual orientation. The BIA therefore rejected Iraheta's CAT claim without addressing the acquiescence issue.

The BIA said nothing about asylum. In a footnote in his BIA brief, Iraheta argued that he was eligible for asylum and that he wished to "preserve[] the argument that [he] should

be considered for asylum." As he did before the IJ, Iraheta acknowledged "the controlling precedent [*Perez-Guzman*] holding that individuals with reinstated removal orders are ineligible for asylum," but asserted that it "was wrongly decided."

## II

The BIA had jurisdiction to review Iraheta's removal order under 8 C.F.R. §§ 1003.1(b)(3) and 1240.15. We have jurisdiction over this petition for review under 8 U.S.C. § 1252(a)(5). We review *de novo* the BIA's conclusions on pure questions of law. *See Conde Quevedo v. Barr*, 947 F.3d 1238, 1241 (9th Cir. 2020). We review the BIA's factual findings for substantial evidence. *See Medina-Rodriguez v. Barr*, 979 F.3d 738, 744 (9th Cir. 2020).

## III

After DHS reinstated Iraheta's removal order in May 2017, Iraheta expressed a fear of persecution, and an asylum officer assigned his case to an IJ for a "withholding-only" proceeding, in which Iraheta was given the opportunity to seek withholding of removal and CAT relief, but not asylum. *See* 8 C.F.R. § 1208.31(e) (limiting such proceedings to "consideration of the request for withholding of removal only"). Iraheta claims that the agency's refusal to consider whether he was entitled to asylum in light of circumstances that arose after the removal order was first issued violated both the INA and the Constitution.

## A

The fact that the BIA did not expressly address Iraheta's eligibility for asylum does not by itself raise jurisdictional concerns, as the BIA cannot preclude judicial review of a

properly raised issue by not mentioning it. But given the BIA's silence, we must ensure either that Iraheta exhausted the asylum issue or that exhaustion is excused, for if he did not exhaust and exhaustion is not excused, we lack jurisdiction to consider the issue. *See Alvarado v. Holder*, 759 F.3d 1121, 1127 & n.5 (9th Cir. 2014) ("Generally, 8 U.S.C. § 1252(d)(1) 'mandates exhaustion and therefore . . . bars us, for lack of subject-matter jurisdiction, from reaching the merits of a legal claim not presented in administrative proceedings below.'") (alteration in original) (quoting *Barron v. Ashcroft*, 358 F.3d 674, 678 (9th Cir. 2004)); *Vasquez-Rodriguez v. Garland*, —F.4th —, 2021 WL 3413164, at *5 (9th Cir. Aug. 5, 2021) ("[A]liens need not exhaust in cases 'where resort to the agency would be futile.'") (quoting *Sun v. Ashcroft*, 370 F.3d 932, 943 (9th Cir. 2004)).

Iraheta presents two claims regarding asylum, one being that the INA allowed him to seek asylum given the circumstances that arose after his prior order of removal was entered, and the other, stated in the alternative, being that he had a procedural due process right to DHS's consideration of whether, given those changed circumstances, his prior order of removal should have been reinstated. These are analytically distinct claims. If Iraheta is correct on his statutory argument, then he may apply for asylum, period. But if he is correct only on his due process argument, then he wins only the right to have DHS *consider* whether to give him fresh removal proceedings rather than reinstating his prior removal order.

There is no need to decide whether Iraheta exhausted his statutory claim because the futility exception would excuse any failure to do so. The governing regulation provides that noncitizens with reinstated removal orders who express a

reasonable fear of persecution or torture if returned to their country of removal may pursue before the IJ "withholding of removal *only*."  8 C.F.R. § 1208.31(e) (emphasis added). As we explained in *Perez-Guzman*, "the BIA ha[s] no authority to disregard this regulation."  835 F.3d at 1073. Accordingly, it would have been futile for Iraheta to urge the BIA (or the IJ) to disregard the regulation, and allow him to seek asylum, on the ground that the INA allows noncitizens with reinstated removal orders to seek asylum if they can show a change in pertinent circumstances since entry of the prior removal order.  *See Coyt v. Holder*, 593 F.3d 902, 905 (9th Cir. 2010) ("Because the BIA has no authority to declare a regulation invalid, 'the exhaustion doctrine does not bar review of a question concerning the validity of an INS regulation because of a conflict with a statute.'") (quoting *Espinoza-Gutierrez v. Smith*, 94 F.3d 1270, 1273 (9th Cir. 1996)); *see also Perez-Guzman*, 835 F.3d at 1073 (citing *Coyt* in holding that "exhaustion would have been futile" for a noncitizen with a reinstated removal order to urge the BIA to disregard § 1208.31(e) and allow him to seek asylum).

A possible fly in the ointment is that Iraheta conceded before the IJ and the BIA that his statutory claim was foreclosed by *Perez-Guzman*, while here he effectively withdraws that concession, arguing that he is eligible for asylum notwithstanding *Perez-Guzman*.  But the government does not press a waiver argument, so we need not decide whether Iraheta's concession before the agency that *Perez-Guzman* forecloses his asylum eligibility waived his right to argue here that *Perez-Guzman* does no such thing.  *See United States v. Tercero*, 734 F.3d 979, 981 (9th Cir. 2013) ("It is well-established that the government can waive waiver implicitly by failing to assert it.") (quoting *Norwood v. Vance*, 591 F.3d 1062, 1068 (9th Cir. 2010)).

The futility exception likewise excuses Iraheta's failure to press his due process claim before the IJ or the BIA. "An exception to the exhaustion requirement has been carved for constitutional challenges to . . . [DHS] procedures." *Sola v. Holder*, 720 F.3d 1134, 1135 (9th Cir. 2013) (per curiam) (first alteration in original) (quoting *Rashtabadi v. INS*, 23 F.3d 1562, 1567 (9th Cir. 1994)). As to due process claims in particular, "[t]he key is to distinguish the procedural errors, constitutional or otherwise, that are correctable by the administrative tribunal from those that lie outside the BIA's ken." *Id*. (quoting *Liu v. Waters*, 55 F.3d 421, 426 (9th Cir. 1995)). Thus, the question here is whether the BIA could have granted Iraheta relief on his due process claim had he raised it in his agency appeal.

The answer is no. The governing regulation provides that "[t]he scope of review in [withholding of removal] proceedings . . . shall be limited to a determination of whether the alien is eligible for withholding or deferral of removal," and that, "[d]uring such proceedings, all parties are prohibited from raising or considering any other issues, including but not limited to issues of admissibility, deportability, eligibility for waivers, and *eligibility for any other form of relief*." 8 C.F.R. § 1208.2(c)(3)(i) (emphasis added). Fairly read, this regulation would have precluded the IJ or the BIA from correcting what Iraheta now contends is the constitutional error, *i.e.*, DHS's failure to consider whether, in light of his particular circumstances, it should overlook rather than reinstate the prior removal order. *See Johnson v. Guzman Chavez*, 141 S. Ct. 2271, 2283 (2021) (holding that reasonable fear proceedings for a noncitizen with a reinstated order of removal "are 'limited to a determination of whether the alien is eligible for withholding or deferral of removal,' and as such, 'all parties are prohibited from raising or considering any other issues,

including but not limited to issues of admissibility, deportability, eligibility for waivers, and eligibility for any other form of relief'") (quoting 8 C.F.R. §§ 208.2(c)(3)(i), 1208.2(c)(3)(i)).    We therefore are not deprived of jurisdiction to consider Iraheta's due process claim.

## B

### 1

Iraheta's statutory argument rests on the interplay of several INA provisions, some giving the right to apply for asylum and others limiting or taking away that right.  The question is which of these provisions has the last word where, as here, the noncitizen has a prior order of removal reinstated after unlawfully reentering the United States.

Section 1158(a), which governs "[a]uthority to apply for asylum," reads in pertinent part as follows:

> **(1) In general**
>
> Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, [8 U.S.C. § 1225(b)].

**(2) Exceptions**

**(A) Safe third country**

Paragraph (1) shall not apply to an alien if the Attorney General determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States.

**(B) Time limit**

Subject to subparagraph (D), paragraph (1) shall not apply to an alien unless the alien demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States.

**(C) Previous asylum applications**

Subject to subparagraph (D), paragraph (1) shall not apply to an alien if the alien has previously applied for asylum and had such application denied.

**(D) Changed circumstances**

An application for asylum of an alien may be considered, notwithstanding subparagraphs (B) and (C), if the alien demonstrates to the satisfaction of the Attorney General either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application within the period specified in subparagraph (B).

**(E) Applicability**

Subparagraphs (A) and (B) shall not apply to an unaccompanied alien child (as defined in [6 U.S.C. § 279(g)].

8 U.S.C. § 1158(a).

Subparagraph (a)(1) broadly grants the right to apply for asylum: "Any alien who is physically present in the United States or who arrives in the United States . . . , irrespective of such alien's status, may apply for asylum . . . ." *Id.* § 1158(a)(1); *see United States v. Shill*, 740 F.3d 1347, 1352 (9th Cir. 2014) (holding that the statutory term "any"

indicates "that Congress intended the statute's reach to be broad"). That broad authorization, however, is subject to several "[e]xceptions" in the next subparagraph, § 1158(a)(2). Most relevant here, asylum applications may not be filed more than one year after a noncitizen's arrival in the United States, *see* 8 U.S.C. § 1158(a)(2)(B), and a noncitizen may not seek asylum if a prior application had been denied, *see id*. § 1158(a)(2)(C). Those two exceptions are subject to an exception of their own, providing that a noncitizen may apply for asylum, "notwithstanding" the one-year and previous-denial bars, upon a showing of material "changed circumstances." *Id*. § 1158(a)(2)(D).

Another provision, § 1231(a)(5), addresses what happens upon the reinstatement of a prior removal order upon a noncitizen's unlawful reentry to the United States:

> If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry.

*Id*. § 1231(a)(5); *see Perez-Guzman*, 835 F.3d at 1073 (noting that asylum is a form of "relief under this chapter" for § 1231(a)(5) purposes). Section 1231(a)(5) thus takes away what otherwise would be the right under § 1158(a)(1) to apply for asylum by precluding a noncitizen with a reinstated removal order from applying.

Because Iraheta's current removal proceedings arose out of the reinstatement of his prior removal order, if § 1231(a)(5) governs, he is barred from seeking asylum. However, if § 1158(a)(2)(D) governs, then he is eligible to seek asylum so long as he can demonstrate "changed circumstances" since the prior removal order. The pertinent question, then, is this: if a noncitizen has a prior removal order reinstated after unlawfully reentering the United States, but can show changed circumstances since the prior order was issued, is he eligible to seek asylum? Iraheta says yes, arguing that § 1158(a)(2)(D) controls, while the government says no, arguing that § 1231(a)(5) controls. The government is correct.

We touched on the interplay between §§ 1158(a) and 1231(a)(5) in *Perez-Guzman*. That case did not involve changed circumstances, so we had no reason to examine § 1158(a)(2)(D) in detail. Instead, we addressed the dissonance between § 1158(a)(1)'s rule that "[a]ny" alien can apply for asylum and § 1231(a)(5)'s bar on asylum applications by noncitizens with reinstated removal orders. *See Perez-Guzman*, 835 F.3d at 1071. Unable to resolve the conflict with ordinary tools of statutory construction, we gave *Chevron* deference to the Attorney General's interpretation, reflected in 8 C.F.R. § 1208.31(e), that when a noncitizen with a reinstated removal order expresses a credible fear of persecution, his hearing before an IJ is limited "to consideration of the request for withholding of removal only." *Perez-Guzman*, 835 F.3d at 1074–82. We held that § 1231(a)(5) takes precedence over § 1158(a)(1), and thus that a noncitizen "is not eligible to apply for asylum under § 1158 as long as he is subject to a reinstated removal order." *Id*. at 1082. We bracketed, however, noncitizens potentially covered by § 1158(a)(2)(D). Because the applicant in *Perez-Guzman* was "a first-time asylum

claimant" who "allege[d] no circumstances that materially changed between his removal from the United States and his subsequent reentry," we had "no opportunity . . . to determine how § 1158(a)(2)(D) might affect § 1231(a)(5) in a case where those two provisions are actually in conflict." *Id*. at 1082 & n.10.

That question is now before us.  Two textual clues convince us that the changed-circumstances rule of § 1158(a)(2)(D) applies only within the closed universe of § 1158(a)(2)(B)–(D); that is, § 1158(a)(2)(D)'s grant of the right to apply for asylum comes into play only when that right would otherwise be revoked by § 1158(a)(2)(B) or (C), and not when the revocation is effected by § 1231(a)(5) or any other INA provision.

The first clue is § 1158(a)(2)(D)'s placement within the INA generally and within § 1158(a) in particular.  Recall that § 1158(a) begins with a broad permissive rule—any noncitizen in the United States may apply for asylum. Section 1158(a)(2) cuts back on that rule by carving exceptions, including those in § 1158(a)(2)(B) and (C).  But then § 1158(a)(2) adds the changed-circumstances provision, § 1158(a)(2)(D), another permissive rule.  If Congress meant § 1158(a)(2)(D) to apply broadly— overriding not just the asylum-eligibility bars imposed by § 1158(a)(2)(B) and (C), but other restrictive provisions in the INA as well—why did it place § 1158(a)(2)(D) within § 1158(a)(2)? *See* Pub. L. 104-208, § 604, 110 Stat. 3009, 690–91 (1996) (enacting the language codified at § 1158(a)(2)).  Iraheta provides no answer, and none is apparent to us, particularly given the "notwithstanding subparagraphs (B) and (C)" clause of § 1158(a)(2)(D), which confirms its limited scope.

The second textual clue is the phrase "[s]ubject to subparagraph (D)" at the beginning of both § 1158(a)(2)(B) and (C). That phrase is the mirror image of the "notwithstanding" clause in § 1158(a)(2)(D), creating a closed loop of exceptions (to § 1158(a)(1)'s broad grant of asylum eligibility) and an exception-to-the-exceptions. The "subject to" clauses in § 1158(a)(2)(B) and (C) confirm that those two prohibitions are absolute except for the changed-circumstances exception-to-the-exceptions in § 1158(a)(2)(D), and the "notwithstanding" clause in § 1158(a)(2)(D) confirms that it carves only a narrow exception to the exceptions that appear above it in § 1158(a)(2)(B) and (C). If Iraheta's broad reading of § 1158(a)(2)(D)—that it carves exceptions to *all* limitations in the INA on the right to apply for asylum, and not just those in § 1158(a)(2)(B) and (C)—were correct, what purpose would the "subject to" clauses in § 1158(a)(2)(B) and (C) serve? If Iraheta were right, why does § 1231(a)(5) not have a clause that reads, "subject to subparagraph (a)(2)(D) of section 1158"? And if Iraheta were right, why does § 1158(a)(2)(D) begin with "notwithstanding subparagraphs (B) and (C)" rather than "notwithstanding any other provision of this chapter"? Again, Iraheta provides no answer, and none is apparent to us.

Granted, a "notwithstanding" clause preceding a statutory rule does not necessarily limit the rule's application to situations where the rule clashes with the provisions referenced by the clause. *See NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017) ("A 'notwithstanding' clause . . . just shows which of two or more provisions prevails in the event of a conflict. Such a clause confirms rather than constrains breadth. Singling out one potential conflict might suggest that Congress thought the conflict was particularly difficult to resolve, or was quite likely to arise. But doing so

generally does not imply anything about other, unaddressed conflicts, much less that they should be resolved in the opposite manner."). So Iraheta is correct in arguing that § 1158(a)(2)(D)'s notwithstanding clause must be read in context. But the context of § 1158(a)(2)(D)—specifically, its placement within § 1158(a)(2) and its mutually reinforcing cross-references with § 1158(a)(2)(B) and (C)— shows that it does not override asylum-restrictive provisions in the INA other than § 1158(a)(2)(B) and (C). *See Lara-Aguilar v. Sessions*, 889 F.3d 134, 140–43 (4th Cir. 2018) (reaching the same conclusion).

Pressing the opposite result, Iraheta invokes the general-specific canon, arguing that § 1158(a)(2)(D) more specifically governs his asylum eligibility than does § 1231(a)(5). *See In re Border Infrastructure Env't Litig.*, 915 F.3d 1213, 1225 (9th Cir. 2019) ("The 'general/specific canon' of statutory construction . . . provides that when two conflicting provisions cannot be reconciled, the more specific provision should be treated as an exception to the general rule."). The argument is unpersuasive. As is often the case, determining which of §§ 1158(a)(2)(D) and 1231(a)(5) is "general" and which is "specific" is an unilluminating exercise, rendering the canon inapplicable. *See Perez-Guzman*, 835 F.3d at 1075 ("As Scalia and Garner acknowledge, . . . it is '[s]ometimes . . . difficult to determine whether a provision is a general or a specific one.' Here, the difficulty is that each subsection is specific in certain respects and general in others.") (second and third alterations in original) (citation omitted). In any event, a close reading of both provisions reveals that there is no conflict, rendering the canon inapplicable on that ground as well. *See Lara-Aguilar*, 889 F.3d at 141–43 (holding that "there is no irremediable conflict [between §§ 1158(a)(2)(D)

and 1231(a)(5)] requiring us to invoke the general-specific rule of interpretation").

Iraheta next argues that because the INA allows noncitizens with reinstated removal orders to seek withholding and CAT relief despite the broad bar imposed by § 1231(a)(5), *see Perez-Guzman*, 835 F.3d at 1075 ("[O]ur well-settled interpretation of § 1231(a)(5) recognizes that, notwithstanding the prohibition on 'any relief,' withholding of removal and CAT protection are available to individuals in reinstatement proceedings."), asylum should be available as well. But the availability of certain relief notwithstanding § 1231(a)(5) only underscores that the INA and its implementing regulations offer a comprehensive set of rules governing which noncitizens are eligible for what forms of relief. *See* 8 C.F.R. § 1208.31(e) (allowing an alien with a reinstated removal order to apply for withholding of removal); 8 C.F.R. § 1208.16(c)(4) (allowing applications for CAT protection). The INA makes clear that noncitizens with reinstated removal orders, while eligible to seek withholding and CAT relief, are not eligible to seek asylum.

Iraheta next invokes several presumptions we sometimes apply when encountering ambiguous statutes. For example, he argues that we should adopt his reading of § 1158(a)(2)(D) to avoid running afoul of the United States's treaty obligations. *See Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 252 (1984) ("A treaty will not be deemed to have been abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed.") (citation omitted). He also argues that his reading is necessary to avoid serious due process questions. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018) ("Under the constitutional-avoidance canon, when

statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems."). Neither principle comes into play here, because, as explained, there is no ambiguity in the relationship between §§ 1158(a)(2)(D) and 1231(a)(5). *See Jennings*, 138 S. Ct. at 836 ("[A] court relying on th[e] [constitutional-avoidance] canon still must *interpret* the statute, not rewrite it."); *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142, 1160 (9th Cir. 2020) (holding that a statute's "unambiguous language" overcomes the presumption against abrogating treaty rights).

**2**

Iraheta claims in the alternative that even if the INA did not afford him a statutory right to seek asylum, due process required DHS to consider whether to let him do so anyway. Iraheta observes that DHS has the discretion to overlook a noncitizen's prior removal order rather than reinstate it, which results in the noncitizen entering ordinary removal proceedings, where he can apply for asylum, rather than withholding-only proceedings, where he cannot. *See Perez-Guzman*, 835 F.3d at 1081 ("[T]he government has discretion to forgo reinstatement and instead place an individual in ordinary removal proceedings. Once in ordinary proceedings, the individual can raise an asylum application without implicating § 1231(a)(5)'s bar."); *Villa-Anguiano v. Holder*, 727 F.3d 873, 878 (9th Cir. 2013) ("Even though an alien is not *entitled* to a hearing before an immigration judge on the issue of reinstatement of a prior removal order, nothing in 8 U.S.C. § 1231(a)(5) or its implementing regulations deprives the agency of discretion to afford an alien a new plenary removal hearing."). And as Iraheta notes, we held in *Villa-Anguiano* that "[d]ue process

. . . entitles an unlawfully present alien to consideration of issues relevant to the exercise of an immigration officer's discretion" in deciding whether to reinstate a prior removal order. 727 F.3d at 881. Invoking *Villa-Anguiano*, Iraheta argues that by failing to consider his changed circumstances before reinstating his removal order and thereby depriving him of the ability to seek asylum, DHS violated his procedural due process rights.

Iraheta reads *Villa-Anguiano* too broadly. Our due process discussion there concerned only a noncitizen's right to contest the factual predicates for reinstating a prior removal order—*i.e.*, whether the noncitizen in fact was subject to the removal order and whether his reentry in fact was unlawful—not the right to present arguments why the immigration officer should, as a discretionary matter, decline to reinstate a prior removal order whose factual predicates are clear. *See id.* at 877–81. The immigration officer in *Villa-Anguiano* reinstated a noncitizen's prior removal order, but instead of removing him, the government criminally charged him with illegal reentry under 8 U.S.C. § 1326. *See id*. at 876–77. During the criminal proceedings, the noncitizen lodged a successful collateral challenge to the prior removal order, resulting in its invalidation and the dismissal of his criminal charges. *See id*. Nonetheless, the noncitizen was later removed without being given the opportunity to argue that, because his prior removal order had been invalidated, it was not subject to reinstatement. *See id.* at 877. We held that the noncitizen's due process rights were violated because he was not given a chance to challenge an essential predicate for placing him into reinstatement proceedings—the existence of a valid, prior order of removal. *See id.* at 877–81.

Here, by contrast, Iraheta does not dispute the predicates rendering him lawfully subject to reinstatement. Rather, he contends that due process required DHS to consider whether to forego reinstatement of his prior removal order in light of the facts supporting what he hoped would be his new asylum claim. But *Villa-Anguiano* does not give a noncitizen a due process right to present an argument that may sway DHS in the exercise of its purely discretionary authority to overlook a prior removal order. Indeed, recognizing such a right would undermine the agency's plenary discretion over when to exercise that form of leniency. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("This Court has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion.") (citing cases). The fact of DHS's discretion does not mean that every noncitizen with a prior removal order has a due process right to make his case to DHS for why its discretion should be exercised in his favor.

\*   \*   \*

In sum, Iraheta does not have the right to seek asylum under the INA, and he did not have a constitutional right to have DHS consider whether, as a discretionary matter, to overlook his prior removal order and thereby allow him to seek asylum. Iraheta is ineligible for asylum, and the BIA did not err in declining to allow him to seek asylum.

## IV

We turn next to our review of what the BIA did address on the merits: Iraheta's claims for statutory withholding of removal and CAT relief.

**A**

A noncitizen in removal proceedings may seek withholding of removal under § 1231(b)(3), which prohibits removal to a country where the noncitizen's "life or freedom would be threatened" on account of his "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *see Bare v. Barr*, 975 F.3d 952, 961 (9th Cir. 2020); *Diaz-Reynoso v. Barr*, 968 F.3d 1070, 1084–85 (9th Cir. 2020). To prevail, the noncitizen must show, by a preponderance of the evidence, that he will face persecution on account of a protected ground if removed. *See* 8 C.F.R. § 1208.16(b); *Doe v. Holder*, 736 F.3d 871, 877 (9th Cir. 2013).

Iraheta sought withholding of removal on account of (1) his perceived or imputed membership in the social group of Salvadoran gay men and (2) his anti-gang political opinion.

**1**

Iraheta first challenges the BIA's conclusion that he is not likely to face persecution in El Salvador on account of his imputed sexual orientation. Both the IJ and the BIA assumed that the abuse Iraheta faced in his youth by his father qualifies as persecution due to his perceived sexual orientation, creating a "presumption" that he would be persecuted in the future as well. 8 C.F.R. § 1208.16(b)(1)(i). Because the agency assumed that Iraheta faced past persecution, we do so as well. *See Hanna v. Keisler*, 506 F.3d 933, 938 (9th Cir. 2007).

Once the presumption of future persecution arises, DHS bears the burden to rebut it by demonstrating that either: (1) due to a "fundamental change of circumstances," the

noncitizen would not be persecuted on account of a protected ground; or (2) the noncitizen could avoid future persecution by relocating to another part of the country, and it would be reasonable to expect the noncitizen to relocate. 8 C.F.R. § 1208.16(b)(1)(i)–(ii); *see Vitug v. Holder*, 723 F.3d 1056, 1065 (9th Cir. 2013). Iraheta argues that the agency did not properly recognize the presumption of future persecution. We disagree.

The IJ correctly stated the governing framework, noting that "[i]f an alien demonstrates that he suffered past persecution in the proposed country of removal, the burden shifts to [DHS] to demonstrate that a fundamental change in circumstances has occurred in that country, or that the applicant could safely relocate to another area in the proposed country of removal." *See* 8 C.F.R. § 1208.16(b)(1)). The IJ then found, as a factual matter, that "circumstances have changed," as Iraheta was now "a grown man" who had no need to live with his father. Given that finding, the IJ concluded that Iraheta was not likely to face persecution by his father in the future. The BIA adopted that factual conclusion, discerning no clear error.

Iraheta's attempts to poke holes in the BIA's reasoning are unavailing. First, he contends that the IJ did not properly apply the burden-shifting framework, and thus never actually made a finding of changed circumstances to which the BIA could defer. We disagree. True enough, at one point in her opinion, the IJ referred to "[Iraheta's] burden of demonstrating that he is likely to suffer persecution by his father in the future." That statement's overall context, however, makes clear that the IJ was referring to Iraheta's ultimate burden of showing his entitlement to statutory withholding, and further that she properly understood and held DHS to its burden of showing a change in

circumstances. She then made a factual finding that DHS met its burden, and the BIA was within its rights to defer to that finding.

Iraheta next argues that even if the IJ found changed circumstances that could rebut the presumption of future persecution, the BIA "misapplied its own standard of review," since "[w]hether DHS met its burden to show a fundamental change by a preponderance of the evidence is a mixed question of law and fact subject to *de novo*, not clear error, review." But the BIA set forth the correct standard of review at the outset of its opinion, citing 8 C.F.R. § 1003.1(d)(3), and Iraheta does not point to, and we cannot find, any portion of the opinion that strayed from this standard.

Next, Iraheta argues that the agency could not possibly have carried its burden to show changed circumstances because it was "obligated to introduce evidence" but did not do so. In support, Iraheta cites *Rios v. Ashcroft*, 287 F.3d 895 (9th Cir. 2002), which holds that the agency, to defeat the presumption of future persecution, must "introduce evidence that, on an individualized basis, rebuts a particular applicant's specific grounds for his well-founded fear of future persecution." *Id*. at 901 (quoting *Ernesto Navas v. INS*, 217 F.3d 646, 662 (9th Cir. 2000)). Iraheta interprets *Rios* to establish that DHS can demonstrate changed circumstances only by introducing new evidence of its own, as opposed to drawing inferences from evidence already in the record. But there is no reason why DHS cannot use evidence introduced by the noncitizen to rebut the presumption. DHS did so here by pointing to Iraheta's and Victor's respective ages and life circumstances.

Iraheta also attempts to cast doubt on the BIA's ultimate factual finding that there has been a fundamental change in

his circumstances, arguing that it "misconstrued the evidence." Whether there has been a change in circumstances is a question of fact that we review for substantial evidence. *See Singh v. Holder*, 753 F.3d 826, 830 (9th Cir. 2014). Under that deferential standard, we reject Iraheta's argument, as the record does not compel a conclusion different from the one the IJ reached and to which the BIA deferred. *See Mairena v. Barr*, 917 F.3d 1119, 1123 (9th Cir. 2019) (per curiam); *Jie Shi Liu v. Sessions*, 891 F.3d 834, 837 (9th Cir. 2018).

Iraheta first contends that the IJ erred in treating Victor's advanced age as a relevant change in circumstances. He points out that his father has continued to call him "faggot" over the phone since he last left El Salvador, and that there was evidence in the record (an affidavit from one of Iraheta's brothers) that Victor would beat Iraheta if he returned to El Salvador. In so arguing, Iraheta misconstrues the reasoning behind the IJ's finding of changed circumstances. That finding was based only in part on Victor having aged, making him less able to exert physical dominion over Iraheta. The finding was based as well on the fact that Iraheta himself had aged—specifically, that he had become a "grown man" who was no longer "required to live on his father's property." Iraheta does not point to record evidence suggesting that he will be required to live with his father if removed to El Salvador, so we cannot find fault with the IJ's conclusion that Iraheta, having become an adult, faces materially changed circumstances.

To undermine the conclusion that the passage of time is a relevant changed circumstance, Iraheta points out that his father assaulted him when he was last in El Salvador, in 2010, when he was about 24 years old. The IJ discounted that incident as falling short of persecution "because at the

time of the incident [Iraheta] was an adult man, free to go about his business, free to relocate to wherever he chooses in El Salvador." The IJ's broader logic holds, as there was no evidence that Iraheta was compelled to visit his father when he was last in El Salvador, that he would be compelled to visit his father if removed to El Salvador, or that his father would seek him out and abuse him. We thus have no basis for disturbing the BIA's agreement with the IJ that Iraheta's age is a material changed circumstance.

Iraheta maintains that the 2010 incident with his father "demonstrates that [his] family status has not changed his father's will and ability to harm him." The question, though, is not whether Iraheta's father has the desire to harm him; rather, it is whether Iraheta is more likely than not to be abused by him if returned to El Salvador. Even if Iraheta were likely to face abuse *if he visited his father's house*, that would not compel the more general conclusion that he is likely to face abuse *if removed to El Salvador*.

Finally, Iraheta contends that even if the BIA were correct that DHS rebutted the presumption of future persecution from his father, the BIA failed to apply that presumption to other Salvadoran actors who might also persecute him for being or appearing to be gay. In Iraheta's view, "[b]ecause the BIA assumed Mr. Iraheta established past persecution on the basis of his imputed homosexuality, it should have required [the government] to show a change in circumstances such that Mr. Iraheta would not be harmed by his father *or others* for this reason."

Iraheta invokes *Hanna v. Keisler* to support his position, but he misreads that decision. *Hanna* involved an Iraqi national who had been persecuted in his home country, before the Iraq War, by forces loyal to Saddam Hussein. *See* 506 F.3d at 936–37. The BIA assumed past persecution,

shifting the burden to DHS, but found that the regime change following Saddam's ouster effected a fundamental change of circumstances that rebutted the presumption of future persecution. *Id*. at 938. We disagreed, noting that the regime change "alone d[id] not satisfy the government's burden to show that circumstances have changed." *Id*. We held, rather, that "the government['s] show[ing] . . . that Hanna would not be persecuted on account of his religion by a government led by Saddam Hussein" did not establish that he would not be persecuted by others on that basis. *Id*.; *see id*. at 938 n.1 ("If anything, the changed circumstances in Iraq would seem to make it more likely, not less likely, that Hanna would suffer persecution in Iraq on account of his religion.").

*Hanna* does not stand for the proposition that whenever an applicant for withholding of removal shows past persecution, DHS can defeat the presumption of future persecution only by affirmatively proving that no one else will persecute the applicant on the same basis. Rather, *Hanna* is a straightforward application of the burden-shifting framework: to rebut the presumption, DHS must show not just any change of circumstances, but a change of circumstances "such that the applicant's life or freedom would not be threatened on account of any of the five [protected] grounds." 8 C.F.R. § 1208.16(b)(1)(i)(A). Here, DHS did just that, showing that the only person who had ever persecuted Iraheta on account of his imputed sexual orientation—in fact, the only person in El Salvador who even perceived him to be gay—would no longer able to do so because Iraheta was no longer compelled to live in his father's home. In the BIA's view, that change in circumstances made it unlikely that Iraheta would face further persecution on that ground. As the IJ explained in the portion of her opinion denying CAT relief: "There is not

sufficient evidence in the record to indicate or to conclude that a community would even perceive [Iraheta] to be gay. It seems that only two people may have perceived him as such, his father, and a man he got into an argument with in the United States."

Iraheta also argues that the country-conditions evidence showed that violence against LGBT individuals in El Salvador is rampant, and thus that substantial evidence did not support the BIA's conclusion that he would not be persecuted by others on account of his perceived sexual orientation. But the record does not compel Iraheta's view of the evidence, particularly since it supports a finding that others in El Salvador did not perceive Iraheta to be gay. The same rationale sinks Iraheta's argument that he is likely to be persecuted if he returned to his hometown because "[c]ommunity assumptions about sexuality are informed by a person's family, and Mr. Iraheta's treatment by his father was well-known." The fact remains that there was no evidence of anyone else perceiving Iraheta as gay in all his years in El Salvador.

Because the BIA's finding of changed circumstances was sound and sufficient to rebut the presumption of future persecution on account of Iraheta's perceived sexual orientation, there is no need to address the BIA's finding that Iraheta could safely relocate within El Salvador.

**2**

Iraheta's claim of persecution based on political opinion rests on a telephonic threat made by his brother Valentin when Iraheta was in the United States. Iraheta does not claim that he faced persecution on this basis in the past, so there is no presumption of future persecution. He therefore bears the burden of showing that he is more likely than not

to be persecuted on the basis of his anti-gang beliefs if removed to El Salvador.

The IJ concluded, after considering the phone call and country-conditions evidence, that it was not more likely than not that MS-13 or Valentin would harm Iraheta if he returned to El Salvador. The BIA found no clear error in this factual determination. The record does not compel a different conclusion.

In pressing the opposite result, Iraheta focuses on one aspect of the BIA's reasoning: that "[t]here is no evidence in the record that his brother has tried to harm [Iraheta] while in the United States." Iraheta correctly suggests that this point is not compelling, as there is no reason to think Valentin has either the will or capacity to harm Iraheta outside of El Salvador. But that one possible misstep does not doom the BIA's ultimate finding, for the record as a whole offers sufficient support for the IJ's conclusion that Valentin's threat does not demonstrate that he or MS-13 is more likely than not to harm Iraheta. It certainly does not *compel* the conclusion that if Iraheta is removed to El Salvador, the threat is likely to be carried out.

Iraheta responds with evidence showing how dangerous it can be for those who vocally oppose MS-13. Perhaps Iraheta is right that "return to El Salvador is a death sentence for those willing to vocally oppose the MS-13." But Iraheta is far from a vocal opponent of Salvadoran gangs. Rather, the evidence shows only that he once tried to convince his brother to leave the gang. Absent more, we will not "substitute our view of the matter for that of the [agency]." *Prasad v. INS*, 47 F.3d 336, 340 (9th Cir. 1995).

**3**

Iraheta also argued in the agency proceedings that he would be persecuted in El Salvador on account of his membership in several other social groups—as someone who attends a Pentecostal church, as a brother of Valentin, as a son of his parents, and as a "Salvadoran son[] viewed as property by virtue of [his] position within the domestic relationship." Before the BIA, however, Iraheta addressed only the latter two groups, and the BIA rejected his claims, finding that he was not persecuted on the basis of being a son of his parents and that "Salvadoran sons viewed as property by virtue of their position within the domestic relationship" is not a cognizable social group.

In a footnote in his briefing before us, Iraheta explains that he "does not concede the correctness of the BIA's determination on these issues," apparently because he disagrees with an Attorney General opinion on which the BIA relied. *See Matter of A-B-*, 27 I. & N. Dec. 316 (A.G. 2018). But by failing to develop the argument in his opening brief, Iraheta forfeited it. *See Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 606 (9th Cir. 2018); *WildEarth Guardians v. U.S. EPA*, 759 F.3d 1064, 1072 n.3 (9th Cir. 2014).

\* \* \*

In sum, there is no basis for upsetting the BIA's denial of Iraheta's application for withholding of removal.

**B**

In denying Iraheta's request for CAT relief, the IJ found that Iraheta was not likely to face torture in El Salvador for "the same reasons" he was not likely to face persecution for

withholding purposes. The BIA "discern[ed] no clear error" in that determination. The IJ also found that Iraheta had not demonstrated that any torture would occur with the acquiescence of the Salvadoran government, but the BIA declined to reach the acquiescence issue given its agreement with the IJ that Iraheta had failed to show a likelihood of torture. We find no fault with the BIA's decision.

To obtain CAT relief, the applicant must show that it is more likely than not that he will face torture in the country of removal. *See Xochihua-Jaimes v. Barr*, 962 F.3d 1175, 1183 (9th Cir. 2020). "In considering a CAT application, the IJ and BIA must consider 'all evidence relevant to the possibility of future torture,' and must 'consider the aggregate risk that [the applicant] would face.'" *Guerra v. Barr*, 951 F.3d 1128, 1133 (9th Cir. 2020) (alteration in original) (citations omitted) (quoting *Cole v. Holder*, 659 F.3d 762, 770, 775 (9th Cir. 2011)), *amended in other part*, 974 F.3d 909 (9th Cir. 2020); *see also Quijada-Aguilar v. Lynch*, 799 F.3d 1303, 1308 (9th Cir. 2015) ("CAT claims must be considered in terms of the aggregate risk of torture from all sources, and not as separate, divisible CAT claims.").

Iraheta argues that the BIA's factual finding that he was not likely to be tortured in El Salvador was flawed because it "erroneously failed to undertake an aggregate analysis" of all potential sources of torture. True enough, the BIA did not make it perfectly clear that it was performing an aggregate analysis. On balance, though, the BIA said enough to convince us that it did, in fact, find that there is less than a 50% chance that Iraheta will be tortured by all potential sources of torture (Victor and MS-13) in the aggregate.

The BIA bookended its CAT analysis with generalized statements about the overall risk of torture.  At the outset, the BIA explained that it "discern[ed] no clear error in the Immigration Judge's factual finding that [Iraheta] has not shown that he will more likely than not be tortured by, at the instigation of, or with the consent or acquiescence of a public official or other person acting in an official capacity."  That summary is fairly read as approving the IJ's finding that the probability of torture is less than 50% in the aggregate.  The BIA proceeded to analyze the possibilities of torture by MS-13 and Victor separately, but its main point remained in focus: Iraheta failed to establish an *overall* likelihood of torture of greater than 50%.  And that becomes clear again at the end of its analysis, when the BIA summed things up as follows: "[Iraheta] has not demonstrated that he is more likely than not to be tortured in El Salvador . . . ."  The BIA did enough here for its analysis to survive review.  *See Garland v. Ming Dai*, 141 S. Ct. 1669, 1679 (2021) ("[A] reviewing court must 'uphold' even 'a decision of less than ideal clarity if the agency's path may reasonably be discerned.'") (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

## V

Because Iraheta's prior removal order was reinstated, he had no right under the INA to seek asylum and no constitutional right to have DHS consider whether, as a discretionary matter, to decline to reinstate that order.  The BIA correctly applied the frameworks governing Iraheta's requests for withholding of removal and CAT relief, and the factual basis for the BIA's decisions finds support in the evidentiary record.

**PETITION FOR REVIEW DENIED**.