**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| RENE LEMUS-ESCOBAR, | Nos. 18-73423 |
| | 19-71892 |
| *Petitioner*, | |
| | Agency No. |
| v. | A029-182-463 |
| PAMELA BONDI, Attorney General, | ORDER AND |
| | AMENDED |
| *Respondent*. | OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted February 13, 2025
Submission Withdrawn February 13, 2025
Resubmitted March 26, 2025
San Francisco, California

Filed June 16, 2025
Amended November 10, 2025

Before: Susan P. Graber and John B. Owens, Circuit
Judges, and Jack Zouhary,* District Judge.

---

\* The Honorable Jack Zouhary, United States District Judge for the
Northern District of Ohio, sitting by designation.

Order;
Opinion by Judge Graber;
Partial Concurrence and Partial Dissent by Judge Zouhary

## SUMMARY[**]

### Immigration

The panel filed (1) an order amending the opinion filed June 16, 2025, and stating that the petitions for rehearing are otherwise denied and no further petitions for rehearing will be accepted; (2) an amended opinion dismissing in part, denying in part, and granting in part Rene Lemus-Escobar's petition for review of the Board of Immigration Appeals' decision denying relief from removal, and his petition for review of the BIA's denial of his motion to reopen, and remanding; and (3) a partial concurrence and partial dissent.

Addressing the initial denial of relief, the panel began by clarifying the court's jurisdictional rules in light of recent Supreme Court decisions affecting cases such as this one, where Petitioner was denied cancellation of removal under 8 U.S.C. § 1229b(b)(1) and cancellation of removal under the Nicaraguan Adjustment and Central American Relief Act ("NACARA"): *Wilkinson v. Garland*, 601 U.S. 209 (2024); *Patel v. Garland,* 596 U.S. 328 (2022); and *Guerrero-Lasprilla v. Barr*, 589 U.S. 221 (2020).

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

In light of those decisions, the panel explained that the court has jurisdiction over constitutional claims and questions of law under 8 U.S.C. § 1252(a)(2)(D), including fact-intensive mixed questions of law; the court thus has jurisdiction over determinations of statutory eligibility. However, under 8 U.S.C. § 1252(a)(2)(B)(i), the court lacks jurisdiction over purely factual findings, such as an adverse credibility determination or a finding of historical fact; and the court lacks jurisdiction over purely discretionary determinations, such as the agency's denial of cancellation as a matter of discretion.

Next, the panel concluded that the court's precedent foreclosed Petitioner's argument that the agency lacked jurisdiction because the initial notice to appear did not specify the time and place to appear, and that Petitioner's new non-jurisdictional argument was unexhausted.

Addressing Petitioner' mental competency, the panel concluded that the BIA abused its discretion by holding that the record contained insufficient indicia of incompetence to mandate remand to the IJ. In light of the indicia here—head trauma, severe alcohol abuse, dementia, anxiety, depression, memory disturbance, significant medical prescriptions, family testimony about forgetfulness and mental problems, inability to work due to disability, some confusing testimony, and inability to understand some questions—the panel granted and remanded on this issue. However, for efficiency, the panel addressed Petitioner's remaining arguments, on the assumption that Petitioner was competent.

As to asylum and related relief, the panel concluded that the BIA permissibly concluded that Petitioner had withdrawn his asylum application before the IJ.

Next, the panel concluded that the BIA did not err in concluding that Petitioner was ineligible for cancellation of removal on the ground that his conviction under California Penal Code section 246, for shooting a firearm at an inhabited dwelling, is categorically a crime involving moral turpitude. Explaining that the state offense requires an intentional shooting of a firearm, that is, the use of a deadly weapon, in circumstances that necessarily pose a significant risk of bodily harm to another, the panel concluded that the state offense falls within the generic definition of a crime involving moral turpitude. The panel noted that the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), had no effect on its analysis.

As to NACARA cancellation, the panel concluded that Petitioner forfeited and then affirmatively waived any challenge to the BIA's denial of that relief.

Turning to the BIA's denial of Petitioner's motion to reopen, the panel began by clarifying the court's jurisdiction over challenges to the BIA's denial of a motion to reopen an application for cancellation of removal, NACARA cancellation of removal, or other forms of relief listed in § 1252(a)(2)(B)(i). The panel concluded that the court has jurisdiction over the denial of such a motion for a procedural reason (e.g., untimeliness or failure to attach new evidence) and over a denial on the ground that the petitioner has not established a prima facie case of statutory eligibility for relief. But the court lacks jurisdiction when the BIA rules that the petitioner failed to establish that the new evidence would likely change the determination that the petitioner does not warrant a favorable exercise of discretion. And the court always retains jurisdiction over constitutional claims and questions of law. In reaching these conclusions, the panel recognized, as overruled, this court's holding in

*Fernandez v. Gonzales*, 439 F.3d 592 (9th Cir. 2006), concerning jurisdiction over challenges to the denial of reopening with respect to statutory eligibility.

As to the BIA's denial of reopening to seek NACARA cancellation, the panel concluded that the BIA committed no legal error, and the court lacks jurisdiction to review the BIA's holding that it would deny as a matter of discretion.

Finally, the panel addressed the BIA's denial of reopening to seek asylum and related relief based on Petitioner's fears of being removed to Guatemala. The BIA denied reopening for two reasons: failure to submit "new" evidence; and failure to establish a prima facie case. As to the BIA's ruling that the evidence was not "new" because it could have been discovered after the merits hearing but before the appeal to the BIA, the panel concluded this was legal error because evidence is "new" if it was not available at the former hearing before the IJ.

As to the BIA's ruling that Petitioner failed to establish a prima facie case for asylum, withholding of removal and CAT relief, the panel concluded that the BIA did not err by focusing on the time of Petitioner's past harm in concluding that Petitioner was unlikely to prove past persecution. Likewise, the BIA reasonably concluded that the record contained no meaningful evidence that a gang member or drug trafficker would harm him today.

However, the panel concluded that the BIA abused its discretion in denying reopening with respect to Petitioner' claim related to his mental illness. Petitioner fears that, because of his age (68) and significant mental health problems, he will be hospitalized in Federico Mora National Hospital for Mental Health, where he will be abused and tortured. Explaining that Petitioner fears direct physical

violence while institutionalized, and that his claim is supported by specific and credible reports, the panel concluded that Petitioner established at least a "reasonable likelihood" that he would establish a reasonable fear of future harm. The BIA illogically concluded otherwise only by misunderstanding (or mischaracterizing) the nature of his claim as being about generalized healthcare conditions in the country as a whole. The panel also concluded that the same error affected the BIA's analysis of Petitioner's CAT claim.

Concurring in part and dissenting in part, Judge Zouhary wrote that he agreed with the majority on all points except the decision to remand on competency. In Judge Zouhary's view, this was not a case in which Petitioner did not rationally understand his proceedings; rather, he attempted to minimize certain aspects of his claim. Judge Zouhary wrote that remanding cases that lack a legitimate question of competency undermines the finality of proceedings, encourages delay, and further strains our already overburdened immigration courts.

Judge Zouhary reluctantly agreed with the conclusion to remand on fear of future harm. Noting that the record did not reflect that Petitioner is likely to be hospitalized or that he likely belongs to a particular social group, the BIA did not make that finding, and this court cannot affirm the BIA on a ground upon which it did not rely. Judge Zouhary observed that in the decades since Petitioner filed for asylum in 1992, this case has included thousands of pages of documents, dozens of hearings, and multiple appeals, and now, another unfortunate snag in the country's congested and broken immigration system.

## COUNSEL

Thomas Perkinson (argued) and Enrique Arevalo, Law Office of Enrique Arevalo, South Pasadena, California, for Petitioner.

Claire L. Workman (argued), Senior Litigation Counsel; Melissa Neiman-Kelting, John W. Blakeley, and Keith I. McManus, Assistant Directors; Office of Immigration Litigation; Jeffery B. Clark, Acting Assistant Attorney General; Brett A. Shumate, Assistant Attorney General; Brian M. Boynton, Principal Deputy Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

## ORDER

The Opinion filed June 16, 2025, is amended as follows:

On slip opinion page 28, footnote 4 is revised to read in full: <We conclude independently, without reliance on our precedents at this step, that Petitioner was convicted of a crime involving moral turpitude.>

On slip opinion page 48, the existing tagline is replaced with: <**PETITIONS DISMISSED IN PART, DENIED IN PART, AND GRANTED IN PART; REMANDED. The parties shall bear their own costs on appeal.**>

The petitions for rehearing are otherwise DENIED. No further petitions for rehearing will be accepted.

# OPINION

GRABER, Circuit Judge:

Petitioner Rene Lemus-Escobar left his native Guatemala in 1985 and entered the United States without admission or parole. In removal proceedings decades later, he conceded removability but sought several forms of relief, including asylum, withholding of removal, relief under the Convention Against Torture ("CAT"), cancellation of removal under 8 U.S.C. § 1229b(b)(1), and relief pursuant to the Nicaraguan Adjustment and Central American Relief Act ("NACARA"). An immigration judge ("IJ") denied all forms of relief, and the Board of Immigration Appeals ("BIA") upheld the removal order in 2018. Petitioner timely filed a motion to reopen proceedings, but the BIA denied reopening in 2019. Petitioner timely sought review of both decisions.

Since then, the Supreme Court has issued decisions affecting our jurisdiction in cases such as this one, where Petitioner seeks cancellation of removal and NACARA relief. Wilkinson v. Garland, 601 U.S. 209 (2024); Patel v. Garland, 596 U.S. 328 (2022); Guerrero-Lasprilla v. Barr, 589 U.S. 221 (2020). In light of those intervening decisions, we recognize as overruled several aspects of our existing precedents, and we clarify the jurisdictional rules going forward. Applying those rules, we conclude that we lack jurisdiction over some of the agency's decisions, so we dismiss the petitions in part. Assessing the merits where we do have jurisdiction, we deny the petitions in most respects but grant the petitions in part.

FACTUAL AND PROCEDURAL HISTORY

Petitioner is a 67-year-old native and citizen of Guatemala who, as noted, entered the United States in 1985. In the decades following his arrival, he applied for several forms of relief. In 1992, he applied for asylum, withholding of removal, and CAT relief. In 2000, he applied for cancellation of removal pursuant to NACARA. And in 2008, after the government initiated removal proceedings, he applied for cancellation of removal pursuant to 8 U.S.C. § 1229b(b)(1).

At a series of merits hearings spanning the period from 2011 to 2013, Petitioner, his wife, and three of his children testified. The IJ declined to issue an immediate decision, in part because annual limits on grants of cancellation of removal had been met. In 2017, a new IJ took over the case and issued a written decision denying all forms of relief and ordering Petitioner removed to Guatemala.

The IJ found credible the testimony of Petitioner's children, but she found not credible the testimony of Petitioner and his wife. The IJ concluded that Petitioner had withdrawn his application for asylum, withholding of removal, and CAT relief. The IJ denied ordinary cancellation of removal because Petitioner had committed at least one crime involving moral turpitude. In particular, the IJ concluded that two of Petitioner's criminal convictions—for shooting at an inhabited house in 1988, in violation of California Penal Code section 246, and for causing a corporal injury of a spouse in 1993, in violation of California Penal Code section 273.5(a)—were crimes involving moral turpitude. Finally, the IJ denied NACARA relief, concluding that Petitioner had not demonstrated exceptional and extremely unusual hardship and that, in the alternative,

she would deny NACARA relief in the exercise of discretion, primarily because of Petitioner's "multiple criminal convictions and [his] failure to take responsibility for his crimes."

Petitioner hired a new lawyer and appealed to the BIA. In addition to challenging the issues addressed by the IJ, Petitioner argued that the notice to appear was legally deficient and that, because the record contained many indicia of incompetency, the BIA must remand to the IJ for a competency evaluation.

In late 2018, the BIA dismissed the appeal. The BIA upheld the IJ's credibility determinations; rejected the argument concerning the notice to appear; concluded that the record "does not contain sufficient indicia of incompetency such that remand is necessary for the [IJ] to conduct a competency evaluation"; and denied Petitioner's request that the case be remanded for consideration of asylum and related relief. The BIA affirmed the IJ's conclusion that Petitioner was ineligible for ordinary cancellation of removal because he had been convicted of a crime involving moral turpitude. Specifically, the BIA held that Petitioner's 1988 conviction for shooting at an inhabited house was a crime involving moral turpitude and declined to reach, as unnecessary, whether Petitioner's 1993 crime also involved moral turpitude. Finally, the BIA denied NACARA relief, agreeing with the IJ both that Petitioner failed to establish that his removal would result in exceptional and extremely unusual hardship and that, in the alternative, Petitioner "does not merit a favorable exercise of discretion."

In early 2019, Petitioner timely filed a motion to reopen with the BIA. Petitioner attached hundreds of pages of evidence related to his declining health and to his fear of

future harm. He sought to reopen his application for NACARA relief due to additional evidence of hardship to him and his family members. And he sought to reopen his applications for asylum, withholding of removal, and CAT relief both because of evidence that he feared harm if removed to Guatemala and because of evidence that he, in fact, had not withdrawn those applications.

In June 2019, the BIA denied the motion to reopen. Assessing the evidence pertaining to NACARA relief, the BIA held that some of the evidence could have been discovered or presented earlier and that, in any event, Petitioner failed to show that the evidence would likely change the BIA's discretionary denial of relief. With respect to asylum, withholding, and CAT relief, the BIA held that the evidence was not "new" and that Petitioner was not prima facie eligible for the requested relief.

Petitioner timely filed petitions for review of both the 2018 denial of relief on the merits and the 2019 denial of reopening. We consolidated the cases and ordered supplemental briefing on the effect of intervening decisions by the Supreme Court and by this court.

## STANDARDS OF REVIEW

We review de novo questions of law. Ruiz-Colmenares v. Garland, 25 F.4th 742, 748 (9th Cir. 2022). We review for abuse of discretion the BIA's denial of reopening. Bent v. Garland, 115 F.4th 934, 939 (9th Cir. 2024). The BIA abuses its discretion when it acts "arbitrarily, irrationally, or contrary to the law," or "when it fails to provide a reasoned explanation for its actions." Id. (citations and internal quotation marks omitted).

DISCUSSION

We first consider Petitioner's challenge to the initial denial of relief in 2018, before turning to Petitioner's challenge to the denial of reopening in 2019.

A.  The BIA's Initial Denial of Relief in 2018

We address the following issues related to the BIA's initial denial of relief from removal:  (1) our jurisdiction; (2) arguments pertaining to the notice to appear; (3) Petitioner's competency; (4) asylum, withholding of removal, and CAT relief; (5) cancellation of removal; and (6) NACARA cancellation of removal.

1.  Our Jurisdiction

Recent cases have affected our jurisdiction to decide challenges to the BIA's denial of cancellation of removal under 8 U.S.C. § 1229b and cancellation of removal under NACARA.  We clarify our caselaw at the outset.

Title 8 U.S.C. § 1229b authorizes the BIA to cancel the removal of a petitioner.  The analysis proceeds in two steps. Step one concerns statutory eligibility.  A nonpermanent resident is statutorily eligible for cancellation of removal if four elements are met:  (A) physical presence for ten years; (B) good moral character; (C) no conviction for certain categories of crimes, including crimes involving moral turpitude;  and  (D) exceptional and extremely unusual hardship.  8 U.S.C. § 1229b(b)(1).  Even if a person is statutorily eligible for cancellation of removal at step one, the BIA nevertheless may deny cancellation of removal, as a matter of discretion, at step two.  See id. § 1229a(c)(4)(A) (authorizing most relief from removal if the person "(i) satisfies the applicable eligibility requirements; and (ii) . . . merits a favorable exercise of discretion").

Cancellation of removal under NACARA has similar, but not identical, requirements. As relevant here, a person convicted of a crime of moral turpitude remains eligible for NACARA cancellation of removal if the other three requirements listed above are met (physical presence, good moral character, and hardship). 8 C.F.R. § 1240.66(c). And, as with cancellation of removal pursuant to § 1229b(b)(1), even if the person is statutorily eligible at step one, the BIA retains discretion, at step two, to deny NACARA cancellation of removal. 8 C.F.R. § 1240.64(a); Monroy v. Lynch, 821 F.3d 1175, 1177 (9th Cir. 2016).

Under 8 U.S.C. § 1252(a)(2)(B)(i), we lack jurisdiction over "any judgment regarding the granting of relief under" five statutory sections, including the cancellation of removal statute, § 1229b. We thus lack jurisdiction over "any judgment regarding the granting of" cancellation of removal. Id. That rule applies equally to NACARA cancellation of removal because NACARA builds expressly on the procedural and substantive provisions of § 1229b. Monroy, 821 F.3d at 1177. In sum, then, we lack jurisdiction over any judgment regarding cancellation of removal or NACARA cancellation of removal.

In Patel, the Supreme Court interpreted broadly § 1252(a)(2)(B)(i)'s jurisdiction-stripping phrase, "any judgment regarding the granting of relief under" the five listed statutory sections. 596 U.S. at 338–39. The use of the word "'any' means that the provision applies to judgments of whatever kind." Id. at 338 (citation and some internal quotation marks omitted). And the word "regarding" similarly "has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." Id. at 339 (citation and internal quotation marks omitted). "Thus, § 1252(a)(2)(B)(i)

encompasses not just 'the granting of relief' but also any judgment relating to the granting of relief," including the agency's underlying factual findings. Id.; see also Figueroa Ochoa v. Garland, 91 F.4th 1289, 1294–95 (9th Cir. 2024) (describing Patel).

Notably, however, § 1252(a)(2)(D) restores our jurisdiction over "constitutional claims" and, as relevant here, "questions of law." On the topic of what constitutes a "question of law," the Supreme Court issued important rulings in Guerrero-Lasprilla and Wilkinson. In both cases, the Court made clear that the phrase "questions of law" in § 1252(a)(2)(D) encompasses all pure questions of law and mixed questions of law and fact, even very fact-intensive inquiries.

In Guerrero-Lasprilla, the BIA held that the petitioners failed to establish due diligence, which is required to warrant equitable tolling of the deadline for filing a motion to reopen. 589 U.S. at 226. "[T]he underlying facts were not in dispute," but the Fifth Circuit held that diligence is an unreviewable factual question. Id. The Supreme Court disagreed, holding that "whether a given set of facts meets a particular legal standard" is a "question of law" for purposes of § 1252(a)(2)(D). Id. at 227.

In Wilkinson, the IJ concluded that the petitioner was ineligible for cancellation of removal because he failed to establish "exceptional and extremely unusual hardship," and the BIA affirmed. 601 U.S. at 216. Some circuit courts, including ours, had held that the hardship determination was unreviewable because it was a "subjective, discretionary judgment." Romero-Torres v. Ashcroft, 327 F.3d 887, 888 (9th Cir. 2003); see Wilkinson, 601 U.S. at 217 n.2 (collecting cases). The Supreme Court disagreed with that

interpretation, holding that the hardship inquiry is an ordinary application of a legal standard to a set of facts. Wilkinson, 601 U.S. at 221–22. "Mixed questions of law and fact, even when they are primarily factual, fall within the statutory definition of 'questions of law' in § 1252(a)(2)(D) and are therefore reviewable." Id. at 225.

Those cases make clear that the step-one statutory eligibility requirements—including hardship—present "questions of law" for purposes of § 1252(a)(2)(D) and that, consequently, we have jurisdiction to review the agency's determination that a particular set of facts does not meet those requirements.[1] We therefore recognize, as overruled, our holding in Romero-Torres that the hardship determination is unreviewable. See Miller v. Gammie, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (holding that we may recognize, as overruled, an earlier holding that conflicts with an intervening Supreme Court decision); see also Gonzalez-Juarez v. Bondi, No. 21-927, 2025 WL 1440220, at *3 (9th Cir. May 20, 2025) (reaching this same conclusion). Other cases that applied Romero-Torres's holding, such as Fernandez v. Gonzales, 439 F.3d 592, 596 (9th Cir. 2006), and Martinez-Rosas v. Gonzales, 424 F.3d 926, 929–30 (9th Cir. 2005), likewise are no longer good law in that respect.

---

[1] Because the agency's determination of facts remains unreviewable, the reviewability of the statutory eligibility standards in some cases may, as a practical matter, have little effect. For example, where the only dispute about continuous physical presence concerns the petitioner's arrival date, the agency's factual finding on that point may mean that this court has no meaningful legal question to review. Similarly, where the agency disbelieves a petitioner's testimony as to hardship, the unreviewable adverse-credibility determination may leave little evidence of hardship for this court to consider.

Before moving on, we note two additional points from Wilkinson. First, even though a fact-intensive mixed question is a "question of law" for the purpose of § 1252(a)(2)(D), those questions still warrant "deferential" review by the circuit court. Wilkinson, 601 U.S. at 225. We recently concluded that we review for substantial evidence fact-intensive mixed questions of this sort. Gonzalez-Juarez, 2025 WL 1440220, at *3–5. Second, "if the IJ decides a noncitizen is eligible for cancellation of removal at step one, his step-two discretionary determination on whether or not to grant cancellation of removal in the particular case is not reviewable as a question of law." Wilkinson, 601 U.S. at 225 n.4. In other words, purely discretionary decisions, like underlying factual determinations, remain unreviewable. Gonzalez-Juarez, 2025 WL 1440220, at *3 n.2.

The overall jurisdictional rule that emerges is straightforward. For challenges to the agency's denial of cancellation of removal or NACARA cancellation of removal, we have jurisdiction over all constitutional claims and questions of law, including fact-intensive mixed questions of law; we thus have jurisdiction over step-one determinations of statutory eligibility. But we lack jurisdiction over purely factual findings, such as an adverse credibility determination or a finding of historical fact; and we lack jurisdiction over purely discretionary determinations, such as the agency's step-two determination that it would deny cancellation as a matter of discretion.

## 2. The Notice to Appear

Petitioner argues, as he did before the BIA, that the agency lacked jurisdiction because the initial notice to appear did not specify the time and place to appear, even though Petitioner received that information in a later notice.

Our precedent forecloses that argument. United States v. Bastide-Hernandez, 39 F.4th 1187, 1193–94 (9th Cir. 2022) (en banc).

Before us, Petitioner also raises a new, non-jurisdictional argument pertaining to the notice to appear. Because Petitioner raised to the BIA only a jurisdictional argument pertaining to the notice to appear, Petitioner failed to exhaust the new argument. Umana-Escobar v. Garland, 69 F.4th 544, 550 (9th Cir. 2023). We therefore deny this portion of the petition. Id.

### 3. Petitioner's Competency

Competency for immigration purposes means having "a rational and factual understanding of the nature and object of the proceedings," an ability to consult with one's lawyer or representative, and "a reasonable opportunity to examine and present evidence and to cross-examine witnesses." Matter of M-A-M-, 25 I&N Dec. 474, 479 (BIA 2011). In Matter of M-A-M-, the BIA set forth the applicable framework for determining competency in immigration proceedings, which stems from the due process rights of the petitioner. Id. We have approved of, and applied, Matter of M-A-M- in several cases. Salgado v. Sessions, 889 F.3d 982 (9th Cir. 2018); Calderon-Rodriguez v. Sessions, 878 F.3d 1179 (9th Cir. 2018); Mejia v. Sessions, 868 F.3d 1118 (9th Cir. 2017).

A petitioner is presumed to be competent and, "[a]bsent indicia of mental incompetency, an Immigration Judge is under no obligation to analyze [a petitioner's] competency." Matter of M-A-M-, 25 I&N Dec. at 477. But "[w]hen there are indicia of incompetency, an Immigration Judge must take measures to determine whether a [petitioner] is competent to participate in proceedings." Id. at 480.

"Indicia of incompetency include a wide variety of observations and evidence," including an inability to understand questions, a high level of distraction, evidence of mental illness or incompetency, medical reports or assessments from past medical treatment related to competency, and testimony of friends and family members concerning that topic.  Id. at 479–80.  If indicia of incompetency are present, the IJ must determine competency and "must . . . articulate" the competency determination and the IJ's reasons.  Id. at 481.  If a petitioner lacks "sufficient competency," the IJ must consider imposing procedural safeguards to ensure that the proceeding is fair.  Id. at 481–83.

Before the IJ, neither Petitioner nor his lawyer raised the issue of competency, and the IJ did not address it sua sponte.  On appeal to the BIA, Petitioner's new lawyer argued that the IJ erred by failing to inquire into the issue.  The BIA rejected the argument, concluding that the record contained no indicia of incompetency.  Petitioner argues that the BIA abused its discretion in concluding that the record contains no indicia of incompetency.[2]

Whether the BIA permissibly concluded that the record contains no indicia of incompetency asks whether a particular set of facts meets a legal standard; accordingly, it is a "question of law" for purposes of 8 U.S.C. § 1252(a)(2)(D).  Wilkinson, 601 U.S. at 225.  We therefore

---

[2] We reject Petitioner's other two arguments concerning competency. The BIA did not allocate the burden of proving competency improperly. Nor is the BIA always required to remand competency challenges to the IJ.  Instead, as the BIA properly recognized, it must determine whether the record contains "sufficient indicia of incompetency such that remand is necessary for the [IJ] to conduct a competency evaluation."

have jurisdiction to review Petitioner's argument. But the question is a fact-intensive one that warrants deferential review. Id. Reflecting that deference, we review for abuse of discretion whether the BIA permissibly concluded that the record contains no indicia of incompetency. Salgado, 889 F.3d at 987 (citing Mejia, 868 F.3d at 1121).

Petitioner points to the following facts in the record. He suffered a significant head injury from a motorcycle accident many years ago, causing a large scar on the back of his head. That accident, along with past alcohol abuse, has damaged his memory, causing what doctors described as "memory loss," "significant memory impairment," and an "inability to recall numerous events." Doctors have diagnosed him with memory disturbance; daily occipital headaches; and Wernicke-Korsakoff Syndrome, a form of dementia. One symptom of the Syndrome is "confabulation," a tendency to make up information that the person cannot recall. The person is not lying in any meaningful sense; the person truly believes the self-fabricated memory. Petitioner testified that one of his present-day doctors "wanted to do surgery on my head, but I didn't accept that." Doctors also have diagnosed him with mental illness, including anxiety and depression, along with concentration difficulties. He takes a wide array of prescription medications, including pain medications, Xanax to treat anxiety and depression, and Donepezil, an anti-dementia drug. He is disabled and unable to work. His wife and son testified about his forgetfulness and his "serious mental problems." Petitioner gave confusing testimony at times, and he was unable to understand some questions. Indeed, at one point, the IJ opined that Petitioner was simply "guessing," rather than remembering.

Considering the totality of the circumstances, the BIA abused its discretion by holding that the record contains

insufficient indicia of incompetence to mandate further inquiry into competency by the IJ.  It is true that each of those pieces of evidence, by itself, may not trigger an IJ's duty to inquire into competency.  For example, "there are many types of mental illness that, even though serious, would not prevent a [petitioner] from meaningfully participating in immigration proceedings."  Matter of M-A-M-, 25 I&N Dec. at 480.  And the evidence does not mean that Petitioner necessarily was incompetent.  Moreover, the standard of review—abuse of discretion—gives the BIA some leeway in determining whether the record contains sufficient indicia of incompetency.

But taken in the aggregate, the evidence in the record clearly contains, at a minimum, indicia of incompetence warranting further inquiry by the IJ pursuant to Matter of M-A-M-.  Each of the types of evidence described above is precisely the type of evidence that Matter of M-A-M- held can be an indicium of incompetence.  See id. at 479–80 ("the inability to understand and respond to questions," "evidence of mental illness," "medical reports," "evidence of applications for disability benefits," "testimony from . . . family members").  The indicia of incompetence here—head trauma, severe alcohol abuse, dementia, anxiety, depression, memory disturbance, significant medical prescriptions, testimony by family members about forgetfulness and mental problems, an inability to work due to disability, some confusing testimony, and an inability to understand some questions—plainly warranted further inquiry by the IJ pursuant to Matter of M-A-M-.

The BIA concluded otherwise primarily because Petitioner testified "coherently" during part of his testimony.  But, as the BIA acknowledged, Petitioner's testimony was far from coherent when testifying—at length—about two

key topics: the events surrounding his 1988 crime and the circumstances of his signing a declaration. Given the extensive and varied evidence of potential incompetence, the BIA's conclusion that the record contains no indicia of incompetency was irrational. We therefore hold that the BIA abused its discretion.

Caselaw supports our conclusion. In Mejia, we held that the BIA abused its discretion by not remanding the matter to the IJ, where the petitioner had fairly significant mental illness. 868 F.3d at 1121–22. We reasoned:

> Here, there were clear indicia of Petitioner's incompetency. He has a history of serious mental illness, including hallucinations, bipolar disorder, and major depression with psychotic features. During hearings before the IJ, Petitioner testified that he was not taking his medications and was feeling unwell. He said he was experiencing symptoms of mental illness and felt a "very strong pressure" in his head. He had difficulty following the IJ's questions, and many of his responses were confused and disjointed. Under In re M-A-M-, those indicia triggered the IJ's duty to explain whether Petitioner was competent and whether procedural safeguards were needed.

Id. In some ways, the evidence of incompetency in this case is not quite as extreme as the evidence in Mejia, because the petitioner in Mejia suffered from more significant mental illness. But, in other ways, the evidence of incompetency here is greater; the evidence such as past head trauma, a form

of dementia that leads to fabricated memories, and testimony by family members of mental issues is more varied than in Mejia. Either way, here, just as in Mejia, the record contains "clear indicia of Petitioner's incompetency" such that the BIA abused its discretion in concluding that the record contained no indicia of incompetency. Id. at 1121.

Petitioner was represented by counsel before the IJ, but that fact does not resolve whether the record contains indicia of incompetency warranting further proceedings. The petitioner in Mejia, too, was represented by counsel before the IJ, but we concluded that the BIA had abused its discretion. Id. at 1120–21. Whether or not the petitioner has counsel, the BIA has placed an affirmative duty on the IJ to make a competency determination whenever the record contains sufficient indicia of incompetency.[3] Matter of M-A-M-, 25 I&N Dec. at 479–80.

In arguing to the contrary, the government leans heavily on Salgado, where we held that the BIA had not erred in upholding the IJ's determination that the petitioner was competent. 889 F.3d at 987–89. In that case, the petitioner's only potential indicium of incompetency was that he had been involved in a minor car collision—the police were not called, the damage to the cars was minimal, he suffered no physical injuries and did not go to the hospital, and he did not tell his lawyer about the incident. Id. at 985–86. The

---

[3] In other circumstances, it might be troubling that Petitioner's lawyer failed to raise the issue of competency before the IJ, only to raise the issue on appeal to the BIA; that tactic could be seen as gamesmanship. Here, though, Petitioner hired a new lawyer after proceedings with the IJ, and that lawyer spotted the issue when reviewing the record. Everyone—including the IJ and the government's lawyer—can avoid the potential inefficiency of a remand by noticing the issue during proceedings before the IJ and by requesting an evaluation.

petitioner stated that he was a little confused and was having some memory problems after the accident.  Id.  We held that "[t]his is a case of poor memory at the most."  Id. at 988.  "The mere inability to recall some events, a common weakness, and other similar mental lapses, are not sufficient to show mental incompetency."  Id. at 989.

This case differs greatly from Salgado, both procedurally and factually.  Procedurally, and by contrast to the IJ's determination in Salgado that the petitioner was competent, the IJ here never made a finding of competency.  On the facts, Petitioner presented extensive medical evidence of significant diagnoses and prescriptions, along with testimony by family members, whereas the petitioner in Salgado presented no medical evidence at all and no testimony from family members.  Unlike the minor car collision at issue in Salgado, the motorcycle crash here resulted in a head injury and a large scar, and Petitioner engaged in severe alcohol abuse for years, causing a form of dementia and medically diagnosed memory impairment.  In short, this is not a simple case of poor memory.

A failure to remand to the IJ can be harmless.  Id.  The government here wisely does not argue that any error here is harmless, likely because the record demonstrates that, had the IJ followed procedural safeguards, the outcome may have been different.  For example, had the IJ verified with Petitioner that he truly intended to withdraw his claims of asylum, withholding of removal, and CAT relief, Petitioner may have told the IJ that his lawyer was mistaken.  As another example, had the IJ been sensitive to Petitioner's medical conditions, the IJ may have taken steps to ensure that Petitioner was not, as the IJ speculated, merely "guessing." (Instead, the IJ found his confusing testimony not credible and ultimately denied discretionary relief due to

Petitioner's lack of remorse and lack of forthright testimony.)  In any event, the government has forfeited any argument about harmlessness.  Iraheta-Martinez v. Garland, 12 F.4th 942, 959 (9th Cir. 2021).

We hold that the BIA abused its discretion by declining to remand to the IJ for a competency determination.  We therefore grant this portion of the petition and remand for further proceedings.  For efficiency, we address the remaining arguments presented by Petitioner, on the assumption that Petitioner was competent.  Should the IJ determine that Petitioner's condition warrants procedural safeguards pursuant to Matter of M-A-M-, we leave it to the agency to determine, in the first instance, the effect of that ruling on the forms of relief sought by Petitioner and on the issues raised in the motion to reopen.

### 4.  Asylum, Withholding of Removal, and CAT Relief

Petitioner submitted an asylum application in 1992, but Petitioner's lawyer withdrew that application during a hearing in 2017.  The IJ noted that Petitioner had withdrawn that application.  On appeal to the BIA, Petitioner argued that the IJ erred by failing to reach the merits of the asylum application.  The BIA disagreed, noting that the record contained no evidence that Petitioner's lawyer did not discuss the withdrawal with him or that Petitioner "was unaware of or opposed to the withdrawal."  Petitioner challenges that determination under several headings, including due process.

Assuming that Petitioner was competent, we reject Petitioner's argument under any standard of review.  In 2017, Petitioner's lawyer expressly stated on the record that the asylum application was "withdrawn."  The IJ immediately asked, "Withdrawn?" and Petitioner's lawyer

responded, "Yes." Petitioner generally is bound by the acts of his lawyer. Garcia v. INS, 222 F.3d 1208, 1209 (9th Cir. 2000) (per curiam). Moreover, during the merits hearings, Petitioner did not present any significant testimony or other evidence in favor of his application for asylum or related relief. The testimony and the focus of the merits hearings were on Petitioner's applications for cancellation of removal and NACARA cancellation of removal. In the circumstances, the BIA permissibly concluded that Petitioner had withdrawn the asylum application.

### 5. Cancellation of Removal

To be statutorily eligible for cancellation of removal, Petitioner must prove that he has not been convicted of a crime involving moral turpitude. 8 U.S.C. §§ 1229b(b)(1)(C), 1182(a)(2)(A)(i)(I); Flores-Vasquez v. Garland, 80 F.4th 921, 924 (9th Cir. 2023). The BIA held that Petitioner's conviction under California Penal Code section 246, for shooting a firearm at an inhabited dwelling, categorically qualified as a crime involving moral turpitude. The BIA accordingly upheld the denial of cancellation of removal. Petitioner challenges that conclusion on appeal.

Whether a state statute categorically defines a crime involving moral turpitude is a question of law that we review de novo. Walcott v. Garland, 21 F.4th 590, 593 (9th Cir. 2021). We therefore have jurisdiction to review the BIA's determination. 8 U.S.C. § 1252(a)(2)(D).

In some circumstances in the past, we deferred, pursuant to Chevron USA v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), to the agency's assessment of whether a crime involves moral turpitude. E.g., Silva v. Garland, 993 F.3d 705, 713 (9th Cir. 2021). Just last year, the Supreme Court overruled Chevron in Loper Bright

Enterprises v. Raimondo, 603 U.S. 369 (2024). For the reasons that follow, however, we conclude that Loper Bright has no effect on our analysis here.

When assessing whether a state crime categorically involves moral turpitude, we first "identify the elements of the statute of conviction." Safaryan v. Barr, 975 F.3d 976, 983–84 (9th Cir. 2020) (citations and internal quotation marks omitted). We have always reviewed this legal question de novo, without any deference to the agency. Barrera-Lima v. Sessions, 901 F.3d 1108, 1114 (9th Cir. 2018). Loper Bright thus has no effect on this step of the analysis.

California Penal Code section 246 punishes "[a]ny person who shall maliciously and willfully discharge a firearm at an inhabited dwelling house, occupied building, occupied motor vehicle, occupied aircraft, inhabited housecar, . . . or inhabited camper." Cal. Penal Code § 246. The statute defines "inhabited" as "currently being used for dwelling purposes, whether occupied or not." Id. The requisite state of mind is recklessness with respect to hitting a target, but it requires intentionally ("maliciously and willfully") shooting a firearm. Covarrubias Teposte v. Holder, 632 F.3d 1049, 1053–54 (9th Cir. 2011). The statute requires, at a minimum, that the perpetrator "intentionally discharged a gun with reckless disregard as to whether the bullet would hit an inhabited vehicle or dwelling." Id. at 1054. The statute "proscribes shooting either directly at or in close proximity to an inhabited or occupied target under circumstances showing a conscious disregard for the probability that one or more bullets will strike the target or persons in or around it." People v. Overman, 24 Cal. Rptr. 3d 798, 805 (Ct. App. 2005).

Having defined the elements of the state statute, we next ask whether the offense "falls within the generic federal definition of a crime involving moral turpitude." Safaryan, 975 F.3d at 985 (alteration adopted) (citation and internal quotation marks omitted). "To involve moral turpitude, a crime requires two essential elements: reprehensible conduct and a culpable mental state." Matter of Silva-Trevino, 26 I&N Dec. 826, 834 (BIA 2016). We have adopted that definition as our own, independent of any deference to the agency. See Safaryan, 975 F.3d at 981 (holding that Chevron deference "is ultimately of 'no practical significance,' because 'we have noted that our understanding of the phrase does not differ materially from the BIA's'" (quoting Marmolejo-Campos v. Holder, 558 F.3d 903, 910 (9th Cir. 2009) (en banc))) (alterations adopted). For that reason, Loper Bright has no effect on the general definition of moral turpitude.

We consider the actus reus and the mens rea "in concert" and on "a sliding scale." Id. at 981–82. For a more egregious actus reus, a lesser mens rea suffices; and for a more intentional mens rea, a lesser actus reus suffices. Id. But there are minimum requirements for both aspects: in general, a recklessness mens rea and some reprehensible conduct are required. Id. at 982. "[W]e presume the conviction rested upon nothing more than the least of the acts criminalized." Ramirez-Contreras v. Sessions, 858 F.3d 1298, 1302 (9th Cir. 2017).

Most of the crimes involving this flavor of moral turpitude have, as an element, a direct risk to the safety of a person. See, e.g., Leal v. Holder, 771 F.3d 1140, 1146 (9th Cir. 2014) (evaluating a statute that required proof of actual and substantial risk of imminent death). Indeed, we have summarized that "non-fraudulent crimes of moral turpitude

almost always involve an intent to harm someone, the actual infliction of harm upon someone, or an action that affects a protected class of victim." Nunez v. Holder, 594 F.3d 1124, 1131 (9th Cir. 2010), superseded in other part as stated in Betansos v. Barr, 928 F.3d 1133, 1135–36 (9th Cir. 2019). But, although most turpitudinous crimes have an element of an intent to harm or substantial risk of harm, not all turpitudinous crimes do—a point that we have stated expressly. See id. at 1131 n.4 ("We do not suggest that every crime that has been held by us to involve moral turpitude falls within this grouping. There are a number of exceptions or outliers."); see also Murillo-Chavez v. Bondi, 128 F.4th 1076, 1088–89 (9th Cir. 2025) (holding that a "specific intent to cause harm 'is not required for a crime to involve moral turpitude'" (quoting United States v. Santacruz, 563 F.3d 894, 897 (9th Cir. 2009) (per curiam))). The relevant test examines the mens rea and actus reus in concert to determine the overall culpability required by the crime. Safaryan, 975 F.3d at 981.

Before Loper Bright, we applied Chevron deference to a BIA's published decision concerning what crimes involve moral turpitude. Lopez v. Garland, 116 F.4th 1032, 1039 (9th Cir. 2024). Now, whether or not the BIA published its decision, "our task is to evaluate the statute independently under Skidmore[ v. Swift & Co, 323 U.S. 134 (1944)], giving 'due respect,' but not binding deference[,] to the agency's interpretation." Id. (citation omitted). We therefore apply Skidmore deference here.[4] The weight given to an agency's interpretation under Skidmore depends on the thoroughness, consistency, and persuasiveness of the

---

[4] We conclude independently, without reliance on our precedents at this step, that Petitioner was convicted of a crime involving moral turpitude.

decision itself.  See id. (summarizing Skidmore deference).  "[W]e have upheld BIA interpretations under Skidmore when the BIA confronted an issue germane to the eventual resolution of the case and resolved it after reasoned consideration."  Id. (all alterations adopted) (citations and internal quotation marks omitted).

Looking first to the mens rea, the statute requires an intentional shooting, "an elevated mens rea."  Moran v. Barr, 960 F.3d 1158, 1162 (9th Cir. 2020).  With respect to hitting a building or person, though, the statute requires only recklessness, the lowest possible mens rea that could qualify as a crime involving moral turpitude.  Safaryan, 975 F.3d at 982.

Looking next to the actus reus, Petitioner emphasizes that the statute requires neither harm to a person nor an intent to harm nor even a reckless disregard of the probability of harming a person.  Considering the least of the acts required by the statute for a conviction, the perpetrator could target an unoccupied, albeit "inhabited," building, and the perpetrator could recklessly disregard the risk of harming the building itself, rather than harming a person.

The California courts convincingly have explained why a conviction for violating section 246 necessarily entails a substantial risk of bodily harm.  The California Court of Appeal rejected, as "disingenuous," the same argument advanced by Petitioner here:  that, "since a person could be convicted of Penal Code section 246 by shooting at a building which was actually unoccupied at the time the shot was fired, the least adjudicated element would simply consist of maliciously shooting at an unoccupied building without the intent or likelihood of committing serious bodily

injury." People v. White, 6 Cal. Rptr. 2d 259, 261 (Ct. App. 1992). The court reasoned:

> It is elementary, yet essential to this analysis, to note that inhabited is defined as "lived in." By definition then, inhabitants are generally in or around the premises. From this, we can readily perceive the inherent danger in one firing a weapon at an inhabited dwelling. Such an act is done with reckless disregard of probable consequences (someone being struck).

Id. (citations omitted). The California Supreme Court followed the same reasoning in concluding that the crime "inherently involves a danger to human life." People v. Hansen, 885 P.2d 1022, 1027 (Cal. 1994), overruled in other part by People v. Chun, 203 P.3d 425, 442 (Cal. 2009).

> In firing a gun at [an inhabited house], there always will exist a significant likelihood that an occupant may be present. Although it is true that a defendant may be guilty of this felony even if, at the time of the shooting, the residents of the inhabited dwelling happen to be absent, the offense nonetheless is one that, viewed in the abstract—as shooting at a structure that currently is used for dwelling purposes—poses a great risk . . . of death.

Id. (internal citation omitted); see also Chun, 203 P.3d at 434 ("[S]hooting at an 'inhabited dwelling house' under section 246 is inherently dangerous even though the inhabited

dwelling house does not have to be actually occupied at the time of the shooting.").

Relatedly, we note that a conviction requires the shooting of a deadly weapon. We repeatedly have held that "the 'use of a deadly or dangerous weapon or instrument' has been treated as a significant aggravating factor in assessing moral turpitude [because] it 'magnifies the danger posed by the perpetrator and demonstrates his or her heightened propensity for violence and indifference to human life.'" Safaryan, 975 F.3d at 988 (quoting Matter of Wu, 27 I&N Dec. 8, 11 (BIA 2017)). We do not suggest that every crime committed by using a deadly weapon necessarily involves moral turpitude. But it is undeniably an aggravating factor, particularly here because the statute requires an intentional shooting.

Putting it all together, California Penal Code section 246 requires an intentional shooting of a firearm, that is, the use of a deadly weapon, in circumstances that necessarily pose a significant risk of bodily harm to another. We hold that the BIA correctly concluded that section 246 categorically qualifies as a crime involving moral turpitude. Accordingly, the BIA did not err in denying cancellation of removal.

## 6. NACARA Cancellation of Removal

Petitioner forfeited and then affirmatively waived any challenge to the BIA's denial of NACARA cancellation of removal. In his opening brief, Petitioner failed to challenge the denial of NACARA relief, thus forfeiting the issue. Iraheta-Martinez, 12 F.4th at 959. Then, after the government pointed out the forfeiture, Petitioner emphatically disclaimed any challenge to NACARA relief: "Lemus does **not** petition for review of the NACARA denial." Petitioner's Reply Brief at 3 (bold emphasis in

original).  We conclude that no discretionary exception to forfeiture or waiver is warranted here.  We therefore do not consider the BIA's initial denial of NACARA cancellation of removal.**[5]**

B.  The BIA's Denial of Reopening in 2019

We address the following issues related to the BIA's denial of reopening:  (1) our jurisdiction; (2) NACARA cancellation of removal; and (3) asylum, withholding of removal, and CAT protection.

1.  Our Jurisdiction

As with review of the initial denial of relief, the Supreme Court's recent cases have affected our jurisdiction over challenges to the BIA's denial of a motion to reopen an application for cancellation of removal.  Once again, we clarify our jurisdiction at the outset.

Congress authorized motions to reopen proceedings.  8 U.S.C. § 1229a(c)(7)(A).  "The motion to reopen is an important safeguard intended to ensure a proper and lawful disposition of immigration proceedings." Kucana v. Holder, 558 U.S. 233, 242 (2010) (citations and internal quotation marks omitted).  "The motion to reopen shall state the new facts that will be proven at a hearing to be held if the motion is granted, and shall be supported by affidavits or other evidentiary material."  8 U.S.C. § 1229a(c)(7)(B).  A motion generally must be filed within 90 days of the entry of a final order of removal.  Id. § 1229a(c)(7)(C)(i).

---

[5] Because credibility pertained solely to the BIA's denial of NACARA cancellation of removal, we also do not address Petitioner's arguments, some of which he casts as legal challenges, concerning the agency's adverse-credibility determination.

The BIA may deny a motion to reopen for three reasons: (a) if the motion is deficient for a preliminary procedural reason, such as untimeliness or a failure to attach new evidence; (b) if the motion does not establish a prima facie case for the underlying relief sought; or (c) if the BIA determines that, even if a prima facie case is established for a form of discretionary relief, the BIA nevertheless would deny relief as a matter of discretion.[6]  Fernandez, 439 F.3d at 599; INS v. Abudu, 485 U.S. 94, 104–05 (1988).

Our defining precedent in this context was our 2006 ruling in Fernandez, 439 F.3d 592, which arose from a denial of reopening of an application for cancellation of removal. We are guided as well by the relevant statutory provisions and the Supreme Court's recent decisions.  As we detailed in Part A-1, 8 U.S.C. § 1252(a)(2)(B)(i) provides that we lack jurisdiction over "any judgment regarding the granting of" several forms of relief, including cancellation of removal, and the Supreme Court gave an expansive interpretation of that phrase in Patel, 596 U.S. at 338–39.  But § 1252(a)(2)(D) grants jurisdiction over all constitutional questions and "questions of law," including all mixed questions of fact and law, no matter how fact-intensive, Wilkinson, 601 U.S. at 225.

---

[6] Because the BIA cannot find facts, 8 C.F.R. § 1003.1(d)(3)(iv); Rodriguez v. Holder, 683 F.3d 1164, 1173 (9th Cir. 2012), the potential jurisdictional bar on purely factual findings does not arise in a BIA's denial of a motion to reopen, see Figueroa Ochoa, 91 F.4th at 1293 (holding, in a case challenging the IJ's denial of a continuance and the BIA's denial of a remand, that we lack jurisdiction over purely factual findings by an IJ).

a. Preliminary Procedural Denial

In Fernandez, we held that we have jurisdiction when "the agency's denial of a motion to reopen applies a procedural statute, regulation, or rule." 439 F.3d at 602. We agree with that result, though our reasoning in light of recent Supreme Court decisions is much more straightforward. A ruling by the BIA that the facts do not meet the legal requirements of a particular procedural statute or regulation is a "question[] of law," 8 U.S.C. § 1252(a)(2)(D), over which we have jurisdiction. Wilkinson, 601 U.S. at 225. We therefore have jurisdiction.

The BIA's determination here—that certain evidence is not "new"—clearly constitutes a decision that a particular set of facts does not meet a legal standard. The set of facts includes the circumstances of the BIA's original decision and the origin and discovery of the proffered evidence. The legal standard is whether the evidence is "new," as that term was used by Congress, 8 U.S.C. § 1229a(c)(7)(B), and as that term has been interpreted by the agency in its regulations, 8 C.F.R. § 1003.2(c)(1). Whether the facts meet the legal standard is a "question[] of law" under § 1252(a)(2)(D). Wilkinson, 601 U.S. at 225. We therefore have jurisdiction to review a BIA's denial of a motion to reopen on the ground that the proffered evidence is not "new." See also Mata v. Lynch, 576 U.S. 143, 148 (2015) (holding that courts have jurisdiction over a BIA's preliminary ruling that a motion to reopen is untimely or "falls short in some other respect"); Kucana, 558 U.S. at 242–53 (holding that courts have jurisdiction over the BIA's preliminary ruling that the petitioner failed to establish changed country conditions to excuse the procedural defects in a second motion to reopen); Magana-Magana v. Bondi, 129 F.4th 557, 566–71 (9th Cir. 2025) (concluding that we

have jurisdiction to review whether "extraordinary circumstances" excused a late motion to reopen).

### b.  Prima Facie Case of Statutory Eligibility

For the same reasons, we conclude that we also have jurisdiction to review the second category of denials.  The BIA's determination that the evidence, accepted as true, does not establish a prima facie case for relief constitutes a decision that a particular set of facts does not meet a legal standard.  The set of facts includes the proffered evidence, accepted as true, and the remaining evidence in the record.  The legal standard is two-fold: a petitioner must establish a prima facie case, which means a "reasonable likelihood that the statutory requirements for relief have been satisfied," Salim v. Lynch, 831 F.3d 1133, 1139 (9th Cir. 2016) (citation and internal quotation marks omitted); and the eligibility requirements for the specific type of relief sought provide the underlying legal standards.  For example, here, Petitioner sought to reopen the application for NACARA cancellation of removal, so he had to establish a reasonable likelihood, id., of demonstrating physical presence for ten years, good moral character, and the requisite hardship, 8 C.F.R. § 1240.66(c).  Accordingly, we have jurisdiction to review a BIA's denial of a motion to reopen on the ground that a petitioner failed to establish a prima facie case of statutory eligibility for relief.

In Fernandez, we engaged in a lengthy discussion about whether we had jurisdiction to review denials of this sort, ultimately concluding that we had jurisdiction over most—but not all—challenges to these denials.  439 F.3d at 599–603; see also id. at 596–99 (describing at length the background statutory and case law).  The reason for the complexity was our starting premise that a step-one hardship

determination was a discretionary judgment over which we lacked jurisdiction. Id. at 596. But Wilkinson overruled that starting premise by, as we have explained, clarifying that whether a particular set of facts meets a statutory eligibility requirement is a question of law, not a discretionary judgment. 601 U.S. at 222.

Because Fernandez's reasoning is clearly irreconcilable with Wilkinson, we recognize, as overruled, Fernandez's holding concerning our jurisdiction over challenges to the BIA's denial of reopening with respect to statutory eligibility. Miller, 335 F.3d at 893. After the Supreme Court's recent decisions, we have jurisdiction to review a decision by the BIA that the petitioner failed to present a prima facie case of statutory eligibility. See Martinez v. Garland, 98 F.4th 1018, 1020–21 (10th Cir. 2024) (holding that the court had jurisdiction to review the BIA's denial of reopening, where the BIA ruled that the petitioner failed to establish a prima facie case of statutory eligibility for cancellation of removal); Cruz-Velasco v. Garland, 58 F.4th 900, 902–03 (7th Cir. 2023) (same); Llanas-Trejo v. Garland, 53 F.4th 458, 461–62 (8th Cir. 2022) (same).

### c.  Discretionary Denial

The final category of denial is a determination by the BIA that, accepting the facts as true and assuming that the petitioner is statutorily eligible for a discretionary form of relief such as NACARA cancellation of removal, the petitioner has not established that the BIA would likely change its discretionary denial. In Fernandez, we held that courts lack jurisdiction over this category of denials because such decisions are judgments relating to the granting of discretionary relief pursuant to § 1252(a)(2)(B)(i). 439 F.3d at 599 n.5.

Fernandez remains good law in that respect because its holding is not clearly irreconcilable with any of the Supreme Court's later cases. Miller, 335 F.3d at 899–900. To the contrary, the Court's later decision in Patel supports Fernandez's holding. Patel emphasized the expansive scope of § 1252(a)(2)(B)(i)'s stripping of jurisdiction over "any judgment regarding the granting of" discretionary relief such as cancellation of removal. 596 U.S. at 338–39. A discretionary judgment regarding the granting of cancellation that causes the denial of a motion to reopen likely remains a judgment regarding the granting of cancellation. See id. at 339 (holding that "§ 1252(a)(2)(B)(i) encompasses not just 'the granting of relief' but also any judgment relating to the granting of relief"); see also Figueroa Ochoa, 91 F.4th at 1294 (holding, primarily because of Patel, that § 1252(a)(2)(B)(i) encompasses the denial of a continuance and the denial of a remand where the underlying relief sought was one of the five statutory provisions listed in § 1252(a)(2)(B)(i)).

That conclusion is confirmed by the rule that, where the immigration statutes provide the BIA unbounded discretion to deny relief, we have no meaningful legal standard to apply. See, e.g., Medina-Morales v. Ashcroft, 371 F.3d 520, 528 (9th Cir. 2004) (referring to decisions of this sort as an exercise of "pure discretion unguided by legal standards or statutory guidelines"); see also Ekimian v. INS, 303 F.3d 1153, 1159 (9th Cir. 2002) (holding that we lack jurisdiction to review the BIA's denial of sua sponte reopening because "we cannot discover a sufficiently meaningful standard against which to judge the BIA's decision not to reopen").

For the same reason, the BIA's discretionary judgment call is not a "question of law" for the purpose of § 1252(a)(2)(D). The BIA considers whether the new

evidence "would likely change" its original determination that discretionary relief was unwarranted.  Fonseca-Fonseca v. Garland, 76 F.4th 1176, 1181 (9th Cir. 2023).  The "would likely change" standard is a legal one, but is incomplete on its own.  The full inquiry is whether the evidence would likely change the BIA's purely discretionary judgment.  We have no meaningful ability to review that judgment, and it falls outside the scope of § 1252(a)(2)(D).

In Kucana, the Supreme Court held, in a case involving untimeliness, that courts generally have jurisdiction to review the BIA's denial of reopening.  558 U.S. at 242–53; see also Mata, 576 U.S. at 147–48 (reaffirming, in a context divorced from § 1252(a)(2)(B)(i), Kucana's holding that courts generally have jurisdiction to review denials of reopening due to untimeliness).  But the Court expressly left open the question "whether review of a reopening denial would be precluded if the court would lack jurisdiction over the [petitioner's] underlying claim for relief."  Kucana, 558 U.S. at 250 n.17.  Here, we would lack jurisdiction over a decision by the BIA that, as a matter of discretion, Petitioner does not warrant NACARA cancellation of removal.  Wilkinson, 601 U.S. at 222.  Neither Kucana nor any other intervening case is clearly irreconcilable with Fernandez's holding that we lack jurisdiction over this category of denials.

In sum, we lack jurisdiction over a BIA's denial of reopening on the ground that it would deny cancellation of removal as a matter of discretion.  We reiterate that we always retain jurisdiction to review constitutional claims and questions of law.  8 U.S.C. § 1252(a)(2)(D).  Even where the BIA states that it would deny relief as a matter of discretion, we retain jurisdiction over legal arguments that the BIA, for example, applied the wrong preliminary law, failed to accept

the proffered evidence as true, or misapplied its regulations. Cf. Fonseca-Fonseca, 76 F.4th at 1181–83 (reviewing whether the BIA applied the correct legal standard when it asked whether the new evidence "would likely change" its decision on statutory eligibility). We lack jurisdiction only over the BIA's purely discretionary judgment that it would deny relief as a matter of discretion. See Moreno v. Garland, 51 F.4th 40, 47 (1st Cir. 2022) (holding, in a case involving a discretionary denial of reopening, that "because we cannot discern any error of law in the BIA's explanation of its conclusion, we have no authority to review the BIA's exercise of discretion").

### d. Summary

In a case where the petitioner seeks to reopen applications for cancellation of removal, NACARA cancellation of removal, or other forms of relief listed in § 1252(a)(2)(B)(i), we conclude as follows.[7] We have jurisdiction over a denial for a preliminary procedural reason and over a denial on the ground that the petitioner has not established a prima facie case of statutory eligibility for relief. But we lack jurisdiction when the BIA rules that the petitioner failed to establish that the new evidence would likely change the BIA's determination that the petitioner does not warrant a favorable exercise of discretion. We always retain jurisdiction over constitutional claims and questions of law.

---

[7] Although we expect these rules to apply in nearly all cases, additional considerations may come into play in other cases, such as jurisdictional bars found in 8 U.S.C. § 1252(a)(2)(A), (B)(ii), & (C). Cf. Bouarfa v. Mayorkas, 604 U.S. 6, 9 (2025) (holding that § 1252(a)(2)(B)(ii) precludes judicial review of revocation of a visa approval). We do not reach those issues.

## 2.  NACARA Cancellation of Removal

The BIA originally denied NACARA cancellation of removal for two alternative reasons:  because Petitioner failed to establish the requisite hardship and because, even if he met the statutory eligibility requirements, he does not warrant a favorable exercise of discretion.  In his motion to reopen this claim, Petitioner submitted extensive documents, including medical evidence of his own health conditions, medical evidence of his wife's health conditions, and declarations from family members.  Petitioner asserted that the evidence tipped the scales with respect to both hardship and discretion.

The BIA denied reopening.  The BIA first held that much of the evidence was not "new" within the meaning of the statute.  But the BIA also held, in the alternative, that Petitioner had not met his burden of establishing that the evidence would likely change the BIA's denial of relief as a matter of discretion.

Applying the analysis in Part B-1, above, we reach the following conclusions as to our jurisdiction.  The BIA's ruling that some of the evidence was not new presents a mixed question of fact and law over which we have jurisdiction.  Wilkinson, 601 U.S. at 212.  But we need not, and do not, reach that question, because we lack jurisdiction to review the BIA's alternative, dispositive holding that it would deny NACARA relief as a matter of discretion.  Fernandez, 439 F.3d at 599 n.5.  Even if the BIA erred in ruling that some evidence was not new, that conclusion would have no effect on the BIA's alternative denial as a matter of discretion, which considered all the evidence.

Petitioner does raise a legal argument over which we have jurisdiction:  he argues that, when making its

discretionary judgment, the BIA failed to consider the evidence in the aggregate. See Franco-Rosendo v. Gonzales, 454 F.3d 965, 966 (9th Cir. 2006) (holding that the BIA must consider the evidence cumulatively in making a discretionary determination). We reject that claim as unsupported by the record. Nothing suggests that the BIA disregarded any evidence or otherwise misapplied the law. See Kohli v. Gonzales, 473 F.3d 1061, 1068 (9th Cir. 2007) (holding that the BIA is presumed to apply the law correctly).

In sum, in assessing the motion to reopen the NACARA application, the BIA committed no legal error, and we lack jurisdiction to review the BIA's discretionary denial of relief. See Moreno, 51 F.4th at 47 ("[B]ecause we cannot discern any error of law in the BIA's explanation of its conclusion, we have no authority to review the BIA's exercise of discretion.").

### 3.   Asylum, Withholding of Removal, and CAT Relief

The BIA originally declined to consider Petitioner's applications for asylum, withholding, and CAT relief. The BIA held Petitioner to his first lawyer's express withdrawal of those applications, noting that Petitioner had not submitted a declaration that his lawyer had erred. In his motion to reopen, Petitioner attached a declaration that he never authorized his lawyer to withdraw those applications and evidence that he filed a complaint with the California State Bar. Concerning his fear of harm, he submitted a declaration and evidence of conditions in Guatemala.

The BIA acknowledged that Petitioner had now complied with the procedural requirements of Matter of Lozada, 19 I&N Dec. 637 (BIA 1988), concerning his original lawyer's ineffectiveness. But the BIA denied

reopening of these claims for two reasons: failure to submit "new" evidence that was not previously available, 8 U.S.C. § 1229a(c)(7)(B), 8 C.F.R. § 1003.2(c)(1); and, even accepting the evidence, failure to establish a prima facie case.

The BIA legally erred in its evidentiary ruling. Petitioner hired his current lawyer after the hearings before the IJ had concluded. The BIA held that the evidence of Petitioner's lawyer's ineffectiveness could have been discovered <u>after</u> the merits hearings but before the appeal to the BIA; accordingly, the evidence was not "new." That ruling is contrary to law:

> [B]oth the statute and the regulation indicate that the evidence must not have been available to be presented "at the former hearing." 8 U.S.C. § 1229a(c)(6)(B); 8 C.F.R. § 1003.2(c)(1). The proffered testimony concerns events that happened after the "former hearing" before the IJ. The government's argument that the information was previously available because it became available during the pendency of the appeal to the Board does not comport with the statute and regulation.

<u>Bhasin v. Gonzales</u>, 423 F.3d 977, 987 (9th Cir. 2005) (emphasis omitted).[8] <u>Bhasin</u> controls here. The BIA erred

---

[8] The statute no longer contains the "at the former hearing" wording, requiring instead only the assertion of "new facts." 8 U.S.C. § 1229a(c)(7)(B). The regulation continues to define that term as evidence that "could not have been discovered or presented <u>at the former hearing</u>." 8 C.F.R. § 1003.2(c)(1) (emphasis added). The government

as a matter of law by ruling that the evidence was not new because it became available <u>after</u> the hearing before the IJ.

We therefore consider the BIA's alternative ruling that Petitioner failed to establish a prima facie case of statutory eligibility.  Petitioner expressed a fear of harm from guerrillas and drug traffickers due to events that occurred in the early 1980s, and he asserted that, because of his severe mental illness, he will be institutionalized and harmed.

   a.   Fear of Harm From Guerrillas and Drug Traffickers

The BIA ruled that Petitioner was unlikely to prove past persecution because he failed to show that, at the time of the past harm, the Guatemalan government was either unable or unwilling to protect him from the harm.  The BIA did not abuse its discretion in assessing the evidence in the record of Guatemala's willingness to protect him from harm in the early 1980s.

Nor did the BIA legally err by focusing on that timeframe.  When assessing whether a petitioner has established <u>past</u> persecution, the relevant inquiry focuses on the government's actions <u>at that time</u>.  See <u>Truong v. Holder</u>, 613 F.3d 938, 941 (9th Cir. 2010) (per curiam) (holding that a petitioner must show that "the persecution was committed either by the government or by forces that the government <u>was</u> unable or unwilling to control" and assessing that prong by considering how the government responded at the time of the past harm (quoting <u>Gormley v. Ashcroft</u>, 364 F.3d 1172,

_____

accordingly does not argue that <u>Bhasin</u> is no longer good law.  To the contrary, the government affirmatively states, after quoting the relevant regulatory text, that "[t]he statutory language requiring 'new facts' does not abrogate the preexisting regulatory requirement that appropriately elaborates on what that means."  Gov't's Response Brief at 62.

1177 (9th Cir. 2004)) (emphasis added)).  Petitioner cites no legal support for the proposition that one measures past persecution by considering how the foreign government today would act.

The BIA also did not abuse its discretion in concluding that Petitioner was unlikely to prevail in establishing an objectively reasonable fear of future harm due to events that occurred more than 30 years earlier.  The BIA reasonably concluded that the record contains no meaningful evidence that a gang member or drug trafficker would harm him today.

b.  Mental Illness

Petitioner submitted considerable evidence that institutionalized mentally ill persons in Guatemala are significantly mistreated.  The Human Rights Report for Guatemala written by the U.S. State Department states:

> The Federico Mora National Hospital for Mental Health, the only public healthcare provider for persons with mental illness, lacked basic supplies, equipment, hygienic living conditions, and adequate professional staff.  Media reported mistreatment of residents, including physical, psychological, and sexual violence by other residents, guards, and hospital staff, especially with respect to women and children with disabilities.  Multiple legal actions were pending against the hospital.

A nonprofit organization concluded from its investigation that "Federico Mora [is] one of the most violen[t] and

dangerous facilities anywhere in the world. Staff and detainees have reported that rape, violence, and other forms of abuse are routine within the facility." Another document reported:

> The actions of the Government often perpetuated segregation and discrimination against persons with disabilities. The country Rapporteur expressed her grave concern about the serious violations of the human rights of persons with disabilities detained in the Federico Mora mental health hospital . . . . Serious human rights violations, including torture and ill treatment of persons with disabilities detained in this hospital, had been reported[.]

In sum, Federico Mora is the only public mental health hospital in the country, and there are many reports of abuse and torture of patients. Petitioner asserted that, because of his age and significant mental health problems, he will be hospitalized in Federico Mora, and then abused and tortured. In asserting asylum and withholding claims, he argued that he belonged to a particular social group of "mentally ill and disabled" persons.

The BIA did not hold that Petitioner was unlikely to be hospitalized or that he likely does not belong to a particular social group. The BIA held, instead, that Petitioner was unlikely to prevail on the merits of his asylum and withholding claims for one reason only: "Evidence that Guatemala has an inadequate healthcare system is not evidence of persecution on account of a protected ground." (Citing Mendoza-Alvarez v. Holder, 714 F.3d 1161, 1165 &

n.2. (9th Cir. 2013) (per curiam)).  We conclude that the BIA abused its discretion.

In Mendoza-Alvarez, we held that an inadequate healthcare system that broadly affects many persons by failing to provide sufficient medication such as insulin cannot support an asylum or withholding claim.  Id. at 1165.  Petitioner's claim here is far more specific:  he fears being hospitalized at one particular hospital, where patients are "routine[ly]" abused.  Petitioner's claim is not a nationwide, generalized claim of inadequate access to medication; he fears direct physical violence while institutionalized, and his claim is supported by specific reports from credible entities.  Under any sensible assessment of the record at the motion-to-reopen stage, Petitioner established at least a "reasonable likelihood" that he would prevail in establishing a reasonable fear of future harm.  Fonseca-Fonseca, 76 F.4th at 1179.  The BIA illogically concluded otherwise only by misunderstanding (or mischaracterizing) the nature of his claim as being about generalized healthcare conditions in the country as a whole.

That same error affected the BIA's analysis of Petitioner's CAT claim.  The BIA held that, "although [Petitioner] has submitted evidence of abusive conditions in mental health institutions in Guatemala, this evidence does not establish a prima facie showing for protection against torture."  The BIA reasoned that "abusive and squalid conditions in mental health institutions will not constitute torture where the evidence plausibly establishes that the conditions are the result of neglect, a lack of resources, or insufficient training and education, rather than a specific intent to cause severe pain and suffering."  Again, the BIA misunderstood Petitioner's claim.  He does not fear generalized harm from an inadequate healthcare system or

from generally poor conditions in the hospital; he fears that he will be locked in the hospital and will experience what has reportedly happened to many others, specifically violent abuse, rape, and torture caused by those with a specific intent to harm.

A comparison to Villegas v. Mukasey, 523 F.3d 984 (9th Cir. 2008), is instructive. There, the petitioner pointed to poor conditions in some Mexican mental hospitals, and we upheld the BIA's determination that no one had a specific intent to harm. Id. at 989. By contrast to the evidence here—detailed reports of significant mistreatment at the sole public mental health hospital in the country, including violence and torture caused by those with an intent to harm, not mere squalor or neglect—the evidence in Villegas generally concerned terrible conditions in hospitals. See id. ("While Villegas is correct that a variety of evidence showed that Mexican mental patients are housed in terrible squalor, nothing indicates that Mexican officials (or private actors to whom officials have acquiesced) created these conditions for the specific purpose of inflicting suffering upon the patients."). Moreover, unlike in Villegas, the BIA here was considering only whether there was a reasonable likelihood that Petitioner would prevail on his CAT claim; in Villegas, the petitioner received a full hearing on the claim, and the IJ and the BIA ruled on the merits of the claim. Id. at 986–87. We conclude that, under any reasonable consideration of the record at the motion-to-reopen stage, Petitioner established a "reasonable likelihood" that he would prevail in establishing a likelihood of future torture. Fonseca-Fonseca, 76 F.4th at 1179.

For its part, the government errs in two respects. First, it refers to the reports of abuse as arising in "only one psychiatric hospital in Guatemala where abuse has

occurred," suggesting that Petitioner might avoid the same fate as other mentally ill patients. Gov't's Response Brief at 76. But the State Department's report referred to that hospital as "the <u>only</u> public healthcare provider for persons with mental illness." (Emphasis added.) Second, the government attempts to bolster the BIA's conclusion by pointing to evidence that the Guatemalan government "is actively trying to improve conditions for patients in mental health facilities." <u>Id.</u> at 77. But the BIA did not cite that reason; it relied solely on the lack of an intent to harm. We may review only the reasons given by the BIA. <u>Suate-Orellana v. Garland</u>, 101 F.4th 624, 628 n.2 (9th Cir. 2024).

**PETITIONS DISMISSED IN PART, DENIED IN PART, AND GRANTED IN PART; REMANDED. The parties shall bear their own costs on appeal.**

---

ZOUHARY, District Judge, concurring in part and dissenting in part:

I agree with the majority opinion on all points except the decision to remand for the agency to examine Petitioner's competency. And, as to fear of future persecution, I join that portion of the Opinion, writing further only to elaborate on why the record supports the BIA's ultimate conclusion.

1. The test for determining whether a petitioner "is competent to participate in immigration proceedings is whether he or she has a rational and factual understanding of the nature and object of the proceedings, can consult with the attorney or representative if there is one, and has a reasonable opportunity to examine and present evidence and

cross-examine witnesses." *Matter of M-a-m-*, 25 I. & N. Dec. 474, 479 (2011).

During the proceedings below, the IJ questioned Petitioner extensively about the discrepancies in his testimony related to his criminal history. She found Petitioner was attempting to "minimize the seriousness of his criminal convictions" and that he had "lied to the court." To explain the discrepancies, Petitioner provided a "last minute" letter from a doctor, which stated Petitioner suffered from Wernicke-Korsakoff Syndrome. The IJ correctly noted that she could not simply rely on the letter, as she had "no background information or CV" and "didn't even know if he was [Petitioner's] doctor during those time periods." She gave Petitioner additional time to provide a CV and further medical testimony.

At the next hearing, Petitioner provided a new neurologist report. But that report noted Petitioner was readily able to communicate -- he was "[a]lert and oriented," "recall[ed] the names of his wife and children readily," was "[a]ble to speak about his line of work," and had normal "language function including spontaneous output, comprehension and repetition intact."

The IJ concluded that there was "some documentation to show that [Petitioner] has memory lapses." But the medical documents did not show Petitioner lacked a rational understanding of his surroundings. Petitioner easily answered questions about his family and his life. And he had multiple opportunities to present sufficient medical evidence, but failed to do so.

In any event, memory loss alone is not enough to show incompetency. *See Salgado v. Sessions*, 889 F.3d 982, 987–89 (9th Cir. 2018) (finding poor memory insufficient where

the petitioner answered questions, was alert, and asked for clarification when confused).  As the BIA noted, the medical records did "not provide any details regarding the extent of [Petitioner's] memory loss," and Petitioner "was able to readily answer questions about this family, where he lives, and his employment."  This was not a case in which Petitioner did not rationally understand the proceedings. Rather, Petitioner attempted to minimize certain aspects of his past.

For these reasons, while I respect the majority's thorough analysis of the other claims, I cannot agree with the decision to remand on competency grounds.  Remanding cases that lack a legitimate question of competency undermines the finality of proceedings, encourages delay, and further strains our already overburdened immigration courts.

2.  I reluctantly agree with the conclusion to remand on the issue of fear of future harm.  While the record does not reflect that Petitioner is likely to be hospitalized or that he likely belongs to a particular social group, the BIA did not make that finding -- though such a finding necessarily flows from the competency discussion above.  Petitioner's current family support, relatives in Guatemala, and lack of medical evidence of disability, do not point to him being institutionalized for a mental illness.  "However, this court cannot affirm the BIA on a ground upon which it did not rely."  *Navas v. I.N.S.*, 217 F.3d 646, 658 n.16 (9th Cir. 2000).

Petitioner initially filed for asylum in 1992.  In the decades since, this case has included thousands of pages of documents, dozens of hearings before different IJs, and

multiple appeals.   Now, another unfortunate snag in our congested and broken immigration system.